**Nancy Anne SPANGLER et al.,
Plaintiffs,
and
United States of America, Plaintiff-
Intervenor,
v.
PASADENA CITY BOARD OF EDUCA-
TION et al., Defendants.**

**Civ. No. 68–1438–R.**

United States District Court,
C. D. California.

Jan. 22, 1970.

Supplemental Findings of Fact
and Conclusions of Law
March 12, 1970.

Edgar Paul Boyko and Michael W. Roberts, Los Angeles, Cal., for plaintiffs.

John N. Mitchell, Atty. Gen., Jerris Leonard, Asst. Atty. Gen., Wm. Matthew Byrne, Jr., U. S. Atty., James Stotter, II, Asst. U. S. Atty., Charles Quaintance, Atty., U. S. Dept. of Justice, Los Angeles, Cal., for plaintiff-intervenor.

John P. Pollock, Pollock, Palmer & Metzler, and John Andrew Miller, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REAL, District Judge.

The Court, having heard the testimony and considered all exhibits, and having heard the argument of counsel, enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The evidence in this case establishes that there is racial imbalance or segregation in the student bodies and faculties of the Pasadena Unified School District at all levels, elementary schools, junior high schools, and senior high schools.

2. That imbalance is a result of defendants' failure to carry out their announced policies of integration, policies that relate both to faculty and student assignments.

3. These failures have occurred in connection with the teacher assignment, hiring, and promotion policies and practices of the District, its construction policies and practices, and its assignment of students.

4. The Court has also noted with concern the racial effects of the District's interclass grouping policies and procedures. Because of the delicate educational nature of decisions concerning grouping, the Court does not at this time deem it appropriate to enter an Order in this regard, but urges the people of Pasadena to examine carefully the grouping policies of their District.

5. Pasadena City Board of Education has used a neighborhood school policy and a policy against forced cross-town bussing to explain its failure to carry out its policies of integrating students and teachers and staff members. The neighborhood school policy is an educational consideration, but it does not normally have constitutional proportions. Under facts of which Pasadena City Board of Education has been aware since at least 1958 as they affect the District's elementary schools, it can be recognized that the use of the neighborhood school policy results in racial imbalance and increasing racial imbalance. The same is true of the policy against cross-town bussing.

## CONCLUSIONS OF LAW

1. In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court was dealing, simply, with racial segregation. The Court made no distinction as to Northern segregation or Southern segregation. The Supreme Court held, simply, that segregated education is inherently unequal, that it deprived Negro children of the educational opportunity to fulfil all their dreams in this country. It further held that all children are deprived, in a constitutional sense, by segregation.

2. Under the facts of this case, use of a strict neighborhood school policy and a policy against cross-town bussing take on constitutional significance as a violation of the Fourteenth Amendment to the Constitution of the United States.

Because time is of the essence in vindicating the right of Pasadena's children to obtain equal educational opportunities, the Court will at this time enter only the findings of fact and conclusions of

law set forth hereinabove. The plaintiff-intervenor may submit additional proposed findings of fact and conclusions of law on or before February 2, 1970; objections, if any, are to be filed on or before February 9, 1970.

### JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law filed herein:

It is ordered, adjudged, and decreed that the defendants, Pasadena City Board of Education, Mrs. LuVerne LaMotte, Albert C. Lowe, Bradford C. Houser, John T. Welsh, and Joseph J. Engholm, as members of the Pasadena City Board of Education, and Ralph W. Hornbeck, as Superintendent of Schools for the Pasadena Unified School District, and each of them, their agents, officers, employees, successors, and all persons acting in concert or participation with them are enjoined from discriminating on the basis of race in the operation of the Pasadena Unified School District.

It is further ordered, adjudged, and decreed that the above-named defendants, and each of them, their agents, officers, employees, successors, and all persons acting in concert or participation with them are enjoined from failing to prepare and adopt a plan to correct racial imbalance at all levels in the Pasadena Unified School District. Defendants are to submit that plan to the Court by February 16, 1970. The plan shall include programs for the assignment, hiring, and promotion of teachers and other professional staff members in such a manner as to reduce racial segregation throughout the District. The plan shall include procedures to be followed and goals to be attained in connection with the location and construction of facilities, both permanent and transportable, that will reduce racial segregation in the District. The plan shall provide for student assignments in such a manner that, by or before the beginning of the school year that commences in September of 1970 there shall be no school in the District, elementary or junior high or senior high school, with a majority of any minority students. The plan shall indicate specifically the expected enrollment by race, at each school in the District at the time the plan is implemented.

The Court retains jurisdiction of this cause in order to continue to observe and evaluate the plans and the execution of the plans of the Pasadena Unified School District in regard to the hiring, promotion, and assignment of teachers and professional staff members, the construction and location of facilities, and the assignment of students.

Claim for attorneys' fees made on behalf of the plaintiffs is denied.

Plaintiffs' costs are taxed against the defendants, and each of them, in the amount of $_____.

Plaintiff-intervenor's cost are taxed against the defendants, and each of them, in the amount of $_____.

### Supplemental

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon consideration of all testimony and exhibits received as evidence in this case, the Court makes the following findings of fact and conclusions of law. Findings of fact numbered 1 through 5, inclusive, are identical to the Findings of Fact filed herein January 22, 1970. The additional findings illustrate the facts upon which the Court relied in making those original findings. Conclusions of law numbered 1 and 2, below, are identical to those filed herein January 22, 1970.

### FINDINGS OF FACT

#### I. ORIGINAL FINDINGS OF FACT

1. The evidence in this case establishes that there is racial imbalance or segregation in the student bodies and faculties of the Pasadena Unified School District at all levels, elementary schools, junior high schools, and senior high schools.

2. That imbalance is a result of defendants' failure to carry out their announced policies of integration, policies that relate both to faculty and student assignments.

3. These failures have occurred in connection with the teacher assignment, hiring, and promotion policies and practices of the District, its construction policies and practices, and its assignment of students.

4. The Court has also noted with concern the racial effects of the District's interclass grouping policies and procedures. Because of the delicate educational nature of decisions concerning grouping, the Court does not at this time deem it appropriate to enter an Order in this regard, but urges the people of Pasadena to examine carefully the grouping policies of their District.

5. Pasadena City Board of Education has used a neighborhood school policy and a policy against forced cross-town bussing to explain its failure to carry out its policies of integrating students and teachers and staff members. The neighborhood school policy is an educational consideration, but it does not normally have constitutional proportions. Under facts of which Pasadena City Board of Education has been aware since at least 1958 as they affect the District's elementary schools, it can be recognized that the use of the neighborhood school policy results in racial imbalance and increasing racial imbalance. The same is true of the policy against cross-town bussing.

## II. BACKGROUND FACTS

6. This is a school desegregation action, commenced by students in the Pasadena Unified School District (hereinafter called, the District), in which the United States intervened as plaintiff after the Attorney General certified it was a case of general public importance, pursuant to Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2. The defendants are the Pasadena City Board of Education (hereinafter called, the Board), its members, and the District's superintendent. Two former Board members, Steve Salisian and John Welsh,[1] were named as defendants, but remain in the case only as to the issue of attorneys' fees raised by plaintiffs.

7. The Board operates the 28 elementary schools, five junior high schools, three senior high schools, and two special schools of the District. The District contains within its boundaries all of the City of Pasadena, the unincorporated town of Altadena, the City of Sierra Madre, and portions of Los Angeles County near the eastern boundary of the City of Pasadena.

8. For the 1969-70 school year the District has enrolled 30,622 students, 17,859 Caucasian, 9,173 black, and 3,590 of Other minority ethnic or racial backgrounds.[2] There are 1,198 teachers, 1,034 white, 121 black, and 43 others. (Govt. Exs. 1D and 3) [3]

## III. SEGREGATION OF STUDENTS

A. The Fact of Racial Segregation

9. Racial segregation or imbalance[4] is especially pronounced in the elementary schools of the District. During the school year 1969-70, 85 percent of the District's black elementary school students attend the eight majority black ele-

---

1. By motion after judgment Henry S. Clark was substituted for defendant John Welsh in his capacity of a member of defendant Board. John Welsh resigned his position and he was replaced on the Board by defendant Henry S. Clark.

2. Throughout these findings, and consistent with District practice, the terms Caucasian and white are used to describe Caucasians without Spanish surnames; Black and Negro are used interchangeably; Other refers to Spanish surnamed Caucasians, Orientals, Indians, and all persons of other minority racial or ethnic backgrounds.

3. Throughout these findings, Govt.Ex. is used to refer to Government's Exhibit; Pl.Ex. refers to Plaintiffs' Exhibit; Def. Ex. refers to Defendants' Exhibit.

4. Racial segregation and racial imbalance are two names for the same phenomenon, racial separation. The terms are used interchangeably throughout these findings and conclusions.

mentary schools, while 93 percent of its white elementary students attend the other 21 elementary schools. There are 13 elementary schools with less than five percent black enrollments; 61 percent of the District's white elementary students and one percent of its black elementary students attend those schools. Cleveland Elementary School has only seven white students in an enrollment of 542. Washington Elementary School is also over 90 percent black, and has 28 white students, 1060 black students, and 70 other students. Three other elementary schools have enrollments over 80 percent black, Jackson, Franklin, and Lincoln; Madison and Audubon are over 60 percent black; Edison is 59 percent black. (Govt. Exs. 1 and 2)

10. At the junior high school level, nearly half of the District's black students (49 percent) attend one school, Washington Junior High School, which itself has an enrollment 88 percent black. Wilson Junior High School, on the other hand, has an enrollment less than one-half of one percent black. The other junior high schools are reasonably well racially balanced. (Govt. Exs. 1 and 2)

11. Muir High School has a minority of white students (48 percent); nearly half (48 percent) of the District's black senior high students attend that school; its enrollment is 37 percent black. Pasadena High School is 12 percent black and 82 percent white. (Govt. Exs. 1 and 2)

12. The degree of racial separation within the District has been consistently high, particularly at the elementary level, over the past 15 years. Each year over 90 percent of the white elementary students have attended majority white schools, while over half of the black elementary students have attended majority black schools. At least 85 percent of the District's Negro elementary school children have attended the eight schools that today have majority black enrollments in every year for which records are in evidence. (Govt. Exs. 1 and 2)

B. Defendant's Actions and Inactions that Have Contributed to and Intensified Racial Separation.

13. Since 1954 defendants have never made an attendance area change that involved assigning students from a majority white residential area to a majority black school. (Govt. Exs. 1 and 11–A through 11–K; Tr. pp. 264, 1797 and 2040) [5]

14. Particularly instructive in this regard is the District's history of assigning elementary and junior high school students from Linda Vista, the area of Pasadena west of the Rose Bowl and north of the Colorado Freeway. The houses in Linda Vista are generally expensive; nearly all the occupants are white. The area has its own elementary school, Linda Vista, with an enrollment this year of 163 white children, one black child, and 12 other children. Cleveland School, 97 percent black, is a mile away. Linda Vista has capacity for 255 students. Cleveland, until 1962, had capacity for 230 students. In 1962 defendants built a ten-room addition to that school, increasing its capacity to 560 students When the Linda Vista School opened, there were not enough children in the area to fill even its limited capacity, and until 1954 the District assigned white children from the Cleveland and Lincoln attendance areas to fill the school. From 1967 until 1969, while the school was closed temporarily due to structural deficiencies, the District transported all Linda Vista's children in kindergarten and grades one through six three miles across the Colorado Freeway to San Rafael Elementary School, where the enrollment in 1967–68 was 457 white, one black, and 11 other students. Five majority black elementary schools, three of them with more unused capacity than San Rafael, are closer to the Linda Vista School than is San Rafael. (Govt. Exs. 1, 6, 10–P, 11–L, 11–M, 14, 12, 13A–C, 70–Exs. 2A–2B, 88–A, 91, Tr. pp. 287–288)

---

5. Page references are to the typed daily transcript.

Students from Linda Vista have attended three white junior high schools, but have never attended the nearest junior high school, Washington. While Washington has been a majority black school only since approximately 1960, it has had more black students than the other four regular junior high schools combined in every year for which records are in evidence. Prior to 1951, the District transported Linda Vista students to Eliot Junior High School, which at that time had no black students. From 1951 to 1961 Linda Vista's junior high school was La Canada, which never had a Negro student. In 1961, La Canada withdrew from the District. At that time, the only two junior high schools in the west half of the District with unused capacity were Washington and McKinley.[6] Washington's enrollment was approximately 60 percent black (and 20 percent white), while McKinley's was approximately 70 percent white (and 15 percent black). Washington is two and a half miles from Linda Vista School, McKinley about three and a half. The Board conducted a meeting at Linda Vista Elementary School on November 29, 1960 to discuss the pending assignment; most parents from the area who spoke expressed a preference for McKinley, some admittedly for racial reasons. Thereafter, the Superintendent appointed a citizen's committee to study the matter. The committee openly considered both racially discriminatory arguments and nonracial arguments before recommending that Linda Vista students be assigned to McKinley Junior High School. The Board voted three to two to do so. The two dissenting members favored assignments of Linda Vista students to Washington because it was closer and because such an assignment would increase integration. While the Board members who favored McKinley assigned nonracial reasons for their vote, it is clear that race was a crucial factor in the decision. (Govt. Exs. 1, 10–A, 10–O, 11–S, 17, 42–B–Ex. 25,[7] 70–Exs. 2A–2D, 86, Tr. pp. 350–370)

15. Similarly, racial considerations entered into the Board's 1962 decision to transfer a portion of majority black Lincoln's attendance area to Cleveland, already over 85 percent black. In 1968, the Board added still more black students to Cleveland's enrollment when it assigned a portion of the Washington attendance area to Cleveland. (Govt. Exs. 1, 10–C, 10–E, 11–C, 11–G, 11–P, 11–R, and 68–E, Ex. 41, Tr. pp. 371–373)

16. Another example of the Board's maintenance and increase of racial imbalance is the attendance areas it has drawn for the District's two largest elementary schools, Washington and Longfellow. The two schools are located little more than a mile from each other. In July of 1954, the District assigned a formerly "neutral" zone[8] between the two schools to Longfellow, although most of the area was closer to Washington. All or nearly all the students in the area were white; Washington was 27 percent black; Longfellow was 97 percent white. A month later, the Board reassigned the northern portion of the "neutral" zone, but to Altadena (which had an enrollment 99.9 percent white), rather than to Washington. Altadena was over-enrolled at the time, in terms of its capacity, while Washington was under-enrolled. (Govt. Exs. 1, 6, 10–A,

---

6. McKinley's enrollment was 1094, its capacity 1210; Washington's enrollment was 1196, its capacity 1278. (Govt.Exs. 1 and 42–B, Ex. 25).

7. The use of "Ex." and a number following another exhibit number denotes an exhibit to a deposition.

8. Until after the Supreme Court's *Brown* decision in May of 1954, the District maintained four neutral zones in which students were permitted to attend either nearby schools with relatively large numbers of Negro students or more distant, but nearly all-white schools. When the neutral zone policy was abandoned three of the areas were assigned to the nearest schools. Until 1954, the District also permitted white students freely to transfer from schools with predominantly black enrollments to all-white or nearly all-white schools, such as Linda Vista. (Govt.Exs. 10–A, 11–A, 11–B, 88–A).

10–B, 11–A, 11–B, 11–L, 11–M, 14, and 88–A)

Ten years later, in 1964, Washington had become 81 percent black; Longfellow was 88 percent white. Both schools were seriously overcrowded. The Board relieved the overcrowding at Longfellow by reassigning white students from the eastern edge of its attendance area to Webster and Burbank elementary schools, both over 97 percent white. Webster was already over-enrolled, but the Board did not consider assigning white students either to Washington or to Madison, which by 1964 had a minority of white students. The Board did not relieve the overcrowding at Washington, as by assigning black students to Longfellow or Altadena, but instead added an eighth transportable classroom at Washington for the 1964–65 school year. Neither Altadena nor Longfellow had any transportables that year. (Govt. Exs. 1, 10–B, 11–D, 11–N, 14, and 70, Ex. 2, Tr. pp. 2140–2143)

In 1966, the Board did attempt to relieve overcrowding at Washington. However, rather than reassigning black students to a white school, such as Altadena or Longfellow, the Board assigned additional black students to Madison, already 44 percent black. Since that assignment aggravated an existing condition of overcrowding at Madison, the Board assigned two portions of the Madison zone to Longfellow. However, Longfellow was already overcrowded, and the two areas were returned to Madison. For reasons now unknown to the Board president at the time, the students in those areas were permitted to attend either Longfellow or Madison. Another portion of the Madison zone was assigned to McKinley. The portions of Madison assigned to Longfellow (then nominally returned) and McKinley were majority white residential areas. The chief racial result of all these changes was the creation of another majority black elementary school; Madison gained approximately 100 black students and lost 80 white students; its black enrollment rose to 55 percent, its white enrollment fell to 25 percent. Longfellow

and McKinley each gained white students, and both remained over 70 percent white. (Govt. Exs. 1, 10–D, 11–E, 11–Q, 14, 66, pp. 4–12, 15 and Ex. 1, and 77, Tr. pp. 715–716 and 2143–2146)

17. At the senior high school level, defendants have made occasional efforts to improve racial balance, but the efforts have been offset in part by changes in senior high school attendance areas that increased imbalance. In and around the year 1957, while a decision was being made as to where to locate Pasadena High School, the Board members were specifically aware that if they located the school in East Pasadena, they would have to exercise particular care in drawing attendance zone lines if they were to avoid having most black students attend Muir High School and most white students attend Pasadena High School. The District did open the new high school in East Pasadena in 1960. In 1961, 1963, 1964, 1966 and 1967 the Board made decisions that increased the concentration of black students at Muir High School. In 1961 the Board subtracted from the Muir High School attendance area and added to the Pasadena High School attendance area the property enclosed within the predominantly white Noyes and Burbank Elementary School attendance areas. In May of 1967, the Board reassigned this area to Muir High School, in order to increase integration. However, on July 10, 1967, the Board rescinded that action and reassigned the area to Pasadena High School. In 1969 defendants took action designed to assign approximately 80 percent of the students in the Noyes and Burbank area to Muir High School. In 1963, the defendants refused to consider a plan recommended to it by a citizens-staff advisory committee that would have resulted in a more nearly equal distribution of white and black students between Muir and Pasadena High Schools. In 1964, the defendants assigned high school students from the white Arroyo Seco Elementary School attendance area to Blair High School, and in 1966, they assigned senior high school students from the white San Rafael Elementary attendance

area to Blair High School. These two areas had previously been within the Muir High School attendance area, and the Board took no adequate steps to replace the white students lost as a result of the two moves. (Govt. Exs. 10–K, 10–L, 10–M, 11–H, 11–K, 11–O, 11–V, 68–A, pp. 61, 88–C, 88)

In each of the years mentioned in the preceding paragraph of this finding, commencing in 1961, defendants took steps to increase the number of white students or decrease the number of black students at Muir. However, except for one zone change that remained in effect for one year (1963), none of those steps added as many white students to Muir as the Board's simultaneous actions subtracted. The Board did take action so that in 1964 there was a reduction of the number of black students at Muir by the creation of a Geographic and Controlled Open District, a device that resulted in the transportation of black students who lived across the street from Muir High School to Pasadena High School or Blair High School. (Govt. Exs. 10–L, 10–M, 11–V, 64, pp. 18–23)

18. The Board and the District's chief administration officers have recognized the need for integration in the District's elementary and junior high schools, as well as senior high schools, since at least 1958. However, the District has taken no effective action to integrate its elementary schools or its two most segregated junior high schools, Washington and Wilson. Numerous promises of studies and action led to nothing beyond the adoption in 1964 and 1965 of open enrollment or free choice plans that, until 1968, permitted a small number of both black and white students to escape Negro schools. The largest number of black students to take advantage of this plan at the elementary level was 86; in the school year 1965–66, of those 86, 40 went to minority white schools, Cleveland and Garfield. (Govt. Exs. 1, 11–O, 16, 19, 24, Tr. pp. 2038–2040 and 2255–2256)

19. The Board has consistently rejected proposals from citizens' committees, its superintendent, and other Board members that would result in significant increases in integration, particularly at the elementary and junior high school level. In 1962, the Board had the Superintendent appoint a citizens-staff committee to review districting problems "at the elementary, junior, and senior high school levels." The committee recommended senior high school attendance area changes that would have increased integration substantially, but the Board rejected those changes in favor of the Open District plan. The Board thereafter voted to disband the committee and not to permit it to study or make recommendations concerning elementary and junior high schools. (Govt. Exs. 11–O, 19, 25–A, 25–G)

During the winter and spring of 1964, the Board received numerous proposals for elementary school desegregation from ad hoc citizens' committees. Board member Shatford urged the study of a triad plan, combining three schools with adjoining attendance areas. The Board's response was to vote not to give further consideration to elementary school redistricting. When Mr. Shatford urged study of junior high school segregation in May of 1964, the Board voted not to consider the matter until 1965. (Govt. Exs. 11–O, 47, Tr. pp. 391–394, 584, 586–587)

In 1965, the Board appointed another citizens' committee, to make recommendations for a bond election. The Board rejected each suggestion by the committee that would have led to additional integration, including the replacement of Arroyo Seco with a larger school, the location of a new junior high school elsewhere than in east Pasadana, and redistricting elementary schools. (Govt. Exs. 26, 27, pp. 49–52, 89, Tr. 2050–2051)

In July of 1967, the Board rescinded Plan A for senior high school redistricting despite the strong contrary recommendation of Superintendent Paul Salmon. Thereafter, Dr. Salmon recommended locating a new integrated elementary school east of Lake Avenue to relieve overcrowding at Washington and Longfellow. Mr. Salisian instructed him

not to specify a location and said he would not support a location east of Lake Avenue for the school. The Board did, nearly a year after rescinding Plan A, authorize the appointment of a director of long range planning, but unanimously directed that he study only senior high schools. (Govt. Exs. 88–P, 103–C, Tr. pp. 256–260, 274–282)

20. In declining to accept recommendations for substantial integration, the Board and members of the administration relied in part, from 1963 through 1967, on an opinion of the county counsel of Los Angeles County to the effect that the Constitution is color blind and that the Board could not take race into account in attempting to improve racial balance. That opinion, rendered June 7, 1963, was directly repudiated by the Supreme Court of California on June 27, 1963, in Jackson v. Pasadena City Board of Education, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878. Pasadena's school officials knew that decision was contrary to the advice they had received from county counsel; they ignored it. Similarly, the Board ignored an opinion of the Attorney General of California that a school board could consider race in attempting to overcome segregation. That opinion, rendered August 15, 1963, was brought specifically to the attention of the Board. The two members of the Board who favored increased integration sought to have the Pasadena Board obtain an opinion on the subject from the Attorney General, but the Board president failed to concern himself with the matter, and the Board majority continued to rely on county counsel's opinion. The Board also ignored a February 1963 directive from the State Board of Education to consider race to overcome racial imbalance. On August 16, 1967, the Board received further notice from a state court that it should act to integrate its schools. A year later, when the Board had taken no effective action, plaintiffs filed this action. It was not until September of 1969 that the Board permitted District officials to commence serious consideration of elementary school integration. (Govt. Exs. 22, 23, 68–A, p. 89, 88–U, 92, Tr. pp. 388–389, 477, 1480, 1733, 2085–2088, 2132–2133, 2255–2256, 2259–2262, Jackson v. Pasadena Board of Education, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963)).

21. When the Board did decide to take action to integrate at the elementary level, it decided to delay the commencement of implementation until the fall of 1971. All Board members favored delay in completion of implementation until 1972 at the secondary level and until 1973 or later at the elementary level. (Govt. Exs. 43, pp. 28–32, 56, pp. 40–42, 63, pp. 23–25, 65, pp. 25–26, Tr. pp. 1507, 1601, 1635–1638, 1778–1779, 1800, 2237–2240)

22. The defendants have adopted a policy of permitting certain schools at each level of instruction to obtain a larger percentage of black student enrollment than in the District as a whole, while attempting to insure that other schools in the District will not obtain a greater percentage of black student enrollment than the percentage of black students in the district as a whole. At the senior high school level, this policy has led the defendants to adopt a policy that will make it unlikely that Blair High School or Pasadena High School will have an enrollment greater than 24 percent black, while it has adopted no such policy as to Muir High School. At the junior high school level, defendants have made adjustments at attendance zones so that Eliot Junior High School, Marshall Junior High School, McKinley Junior High School, and Wilson Junior High School will have an enrollment no more than 30 percent black. They have taken no such step concerning Washington Junior High School. At the elementary level, the defendants have adopted a program to insure that schools with less than 30 percent black enrollment, will continue to have predominantly white enrollments, while they have taken no such steps concerning the predominantly black elementary schools. (Govt. Exs. 1, 10–I, and 42–A, pp. 82–86, Tr. pp. 1683–1685)

23. Defendants have used transportation provided at school district expense to make it possible for white children to avoid attending schools with greater percentages of black students enrolled than in the District as a whole. The District has transported black children at District expense to increase the amount of racial integration, but it has not transported children from majority white residential areas to majority black schools to increase the amount of racial integration. Examples of transporting white students to avoid integration include the transportation of white junior high school students from La Canada to Eliot and Marshall, white junior high school students from Linda Vista to Eliot, La Canada, and McKinley, white elementary students from Linda Vista to San Rafael, and white elementary students from Jefferson to Willard, Hale, and Hamilton. Examples of transporting black children to increase integration include the mandatory assignment of black Open District high school students to Pasadena and Blair High Schools and the assignment of Audubon and Franklin Junior High School students to Marshall. (Govt. Exs. 1, 11–S, 58–A, 58–B, 59–A, 59–B, 59–C, Tr. pp. 882, 886–890)

C. Residential Segregation

24. The record demonstrates the existence of a high degree of residential segregation in the geographic areas the District serves. Linda Vista and San Rafael on the west and the Arroyo Seco and Allendale areas at the southern edge of the District have no or almost no black residents. The same is true of all of Sierra Madre and of the portions of Pasadena and Altadena east of Holliston Avenue. The District has been divided for administrative purposes into 92 roughly equal parts. Of those, 60 (including all 52 in the areas described above) have from zero to five percent Negro student residents. The areas with the highest percentage of black students lie between the Arroyo on the west, Los Robles and Santa Anita Avenues on the east, California Boulevard on the

south, and Altadena Drive on the north. Of the 19 administrative zones in this area, one has over 95 percent Negro student population, six others are over 80 percent black, ten are 51–80 percent black, and two are 21–50 percent black. (Govt. Exs. 97 and 98)

25. The residential segregation described above is due in large measure to racial discrimination. Until 1948, the courts of the State of California enforced racially restrictive covenants. In 1939, Pasadena's Board of Realtors successfully campaigned actively and openly for the adoption and renewal of such covenants. In 1945, the Supreme Court of California acknowledged the commonplace use of restrictive covenants in Pasadena and the resulting "Negro district." The Board of Education obtained a deed to the Allendale school property in 1948 that referred to racially restrictive covenants. The Board has never assigned a black teacher to that school, and it has never had over two black students. (Govt. Exs. 1, 1–C, 3A–C, 4–C, 48, 49A–C, 50, Tr. pp. 592–599, 603 Fairchild v. Raines, Cal.App., 143 P.2d 528 (1943))

From 1948 until at least 1968 it remained the practice of almost every Pasadena realtor to refuse to sell to Negroes in white residential areas. Pasadena realtors interpreted a provision of the realtors code of ethics, forbidding the introduction of undesirable elements into a neighborhood, to make such sales unethical. Even those realtors who declined to be bound by such a gross misinterpretation of their ethical strictures felt compelled to honor the request of a client not to sell to Negroes. The handful of sales that were made to blacks in white areas occasioned acts of intimidation and harassment on the part of private citizens. (Tr. pp. 604–614, 624–630, 648–653 and 673–677)

The passage of the Civil Rights Act of 1968 and the Supreme Court's opinion in Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), have diminished the extent of racial discrimination in the sale and rental of housing in Pasadena. However, black persons con-

tinue to encounter difficulty in obtaining residences in east Pasadena. (Tr. pp. 558, 560–561, 639–640, 677, 680)

26. Defendants have been aware of the existence of residential segregation and the discrimination that underlies it. (Def. Ex. H–1, Tr. pp. 1608–1610)

### D. The Adverse Consequences of Racial Segregation

27. Racial integration provides positive educational benefits. One purpose of education is to prepare children for living in our society, which is a multiracial society. In addition, racial segregation imposes a badge of inferiority on minority students; integration is necessary to remove that badge. (Govt. Exs. 43, p. 27, 63, p. 21, and 64, pp. 41–42, Tr. pp. 334, 1735, 1870 and 2266)

### E. The Existence of Feasible Methods of Overcoming Segregation.

28. The Government's expert witness, Dr. Gordon Foster, director of the Florida Desegregation Consulting Center, testified to the existence of two feasible integration plans for the District. One would involve integrating the student bodies of all schools in the District, while the other would involve most schools west of the Eaton Wash. He testified that in his opinion the District could implement the second plan by September, 1970 and Superintendent Ralph Hornbeck confirmed that the District could do so. The Court so finds. (Govt. Exs. 99A–D and 100 A–C, Tr. pp. 1122–1123 and 2285–2287)

## IV. SEGREGATION OF FACULTY AND STAFF

### A. Discrimination in the Assignment of Faculty and Staff Members

29. There has never been a black teacher, administrator, or other certificated employee assigned to five of the elementary schools in the Pasadena District, Allendale, Linda Vista, Noyes, Sierra Madre and Sierra Mesa, and at another, San Rafael, one black teacher was assigned there for only one year. At a seventh, Willard, the first black teacher was assigned there for this school year. For the 1969–70 school year, there are only four black teachers assigned to the ten elementary schools located east of Allen Avenue. Govt. Exs. 1–C, 3, 3–A, 3–B, 3–C, 4–C, and 6)

For every year for which figures are available, beginning in 1951, over 50 percent of the black certificated employees on the elementary level have been assigned to schools over 50 percent black. For the last three years over 80 percent of the black certificated employees at the elementary level were assigned to majority black schools, and for the 1969–70 school year only five of the 88 black certificated elementary school employees are assigned to the fifteen elementary schools at which black students comprise less than ten percent of the total enrollment. (Govt. Exs. 1, 1–C, 2, 3, 3–A, 3–B, 3–C, 4–C, and 5)

No black teachers, administrators or other certificated personnel were assigned to three of the five junior high schools in the Pasadena District until after the 1960–61 school year. One was assigned to Eliot Junior High School that year, and then in 1963–64 there was one assigned to Marshall and one to Wilson. For the last three years over half of the black certificated employees at the junior high school level have been assigned to Washington, which for that period has been over 75 percent black. There is still only one black teacher at Wilson Junior High School. (Govt. Exs. 1, 1–C, 3, 3–A, 3–B, 3–C, 4–C)

The District has never had a black principal at any school east of Lake Avenue. For the years which information is available, there has never been a black principal or assistant principal at any majority white elementary school. The only black principals or assistant principals at the elementary level since 1966–67 have been assigned to Franklin, Jackson, and Washington Elementary Schools, all schools with over 60 percent black enrollments. (Govt. Exs. 1, 1–C, 3–A, 3–B, 3–C, 4–C, 5, 95–A, 95–B)

The only black administrators at the junior high school level for the same four year period were at Washington Junior High and Eliot Junior High,[9] the two junior high schools with the highest black enrollment. One of these black administrators, Dr. Jesse Moses, principal at Washington Junior High School was transferred to Washington from McKinley Junior High School for the 1965–66 school year without his requesting the transfer, because the Board felt he would "provide good leadership for Washington," which at that time was 70 percent black. (Govt. Exs. 1, 1–C, 3, 3–A, 3–B, 3–C, 4–C, Tr. pp. 2066–2067)

30. The Pasadena District also consistently assigns black substitute teachers to majority black schools, and on the occasions that the black substitutes are assigned to majority white schools they are assigned to schools such as McKinley, Longfellow or Jefferson, rather than to schools such as Arroyo Seco, San Rafael, Sierra Madre or Sierra Mesa. The record shows that of the 619 days taught by black substitute teachers at the elementary level, 507½ (or 82 percent) of the days were spent in the eight most heavily black schools and only 18½ of the days were spent at the 13 schools that now have less than five percent black enrollment. (Govt. Exs. 1 and 9–A)

At the junior high school level, over 50 percent of the 433½ days taught by black substitute teachers were taught at Washington Junior High, the most heavily black junior high school. Similarly 130 of the 157 days taught by black substitute teachers at the senior high school level were taught at Muir, the only minority white senior high school. (Govt. Exs. 1 and 9–A)

The District's assignment of black substitute teachers to black schools enables those substitute teachers who express a desire not to substitute at black schools to avoid doing so. An analysis of Govt. Ex. 9–B shows that the requests of substitute teachers who "don't like Negroes" or who express a desire to teach "on the east side" or "not to teach on the west side" are often granted. At the elementary level, the substitute teachers in Govt. Ex. 9–B who indicated a desire not to teach at majority black schools taught at majority white schools 85.8 percent of the time. (Govt. Exs. 1 and 9–B)

31. There is presently only one black nurse employed by the Pasadena District, of 27. At first she was assigned to Pasadena High School, but in August of 1965 Mrs. Banks received word that she had been transferred, without having submitted a request, from Pasadena High School to Cleveland and Franklin Elementary Schools, which were 90 and 68 percent black, respectively. At the time Mrs. Banks was not given an explanation for the transfer but was later told that she "could make a better contribution and would be an asset to the north-west community working in the two schools." She was replaced at Pasadena High School by a new, white nurse. (Govt. Exs. 1 and 7–A, Tr. pp. 868–872)

32. Another form of discriminatory teacher assignment in the District is one that relates not to the race of the teachers, but to the race of the students. That is the District's practice of assigning less well educated, less experienced and lower paid teachers to majority black schools more frequently than to majority white schools. For example, 28.3 percent of the teachers presently in the majority black elementary schools are probationary teachers with less than three years experience, while only 18.6 percent of the teachers in minority black elementary schools are classified as probationary teachers. Twenty of the sixty-one teachers (32.8 percent) at Washington Junior High School are probationary, while at each of other junior high schools less than 25 percent of the teachers are probationary. (Govt. Exs. 1 and 31)

The average monthly salary at each of the thirteen elementary schools with en-

---

9. The black administrator at Eliot was there for the 1968–69 school year.

rollments less than 10 percent black is higher than the average monthly salary at any of the eight majority black elementary schools in the district. None of the majority white elementary schools has an average monthly salary as low as at any of the five most heavily black elementary schools. The average monthly salary at the thirteen schools with less than 10 percent black enrollment is almost 150 dollars more than that at the schools which have over 90 percent black enrollments. At the junior high school level, all but Washington Junior High School have average salaries over $1,000 a month. The average monthly salary at Washington, the only majority black junior high school is $968.88. (Govt. Exs. 1 and 31)

B. Discrimination in Hiring Teachers

33. While 30 percent of the District's students are black, only ten percent of its faculty members are black. At the senior high school level, only 4.6 percent of the teachers are black. (Govt. Exs. 1–D and 3)

These figures are the result of six factors: active discrimination on the part of District personnel; assignment policies; unchecked veto power over hiring on the part of principals, department heads, and personnel officers; Pasadena's bad reputation among black persons for fair hiring practices; inadequate steps to overcome past discrimination; and a shortage of black teachers.

34. By 1958, the District had still hired only 13 black employees. In that year, Superintendent Jenkins came to Pasadena and gave instructions to improve the District's record. While the record did improve, to 122 in 1966–67, Dr. Jenkins' personnel officers continued actively to discriminate against black applicants. (Govt. Exs. 3–A, 4–C, Tr. pp. 31–32, 87–88, 527, 568–569, 621, 786, 878–879, 885–886, 1953–1957)

Dr. Jenkins' successor, Dr. Salmon, also urged greater efforts to hire quali-

fied black teachers. Again, his efforts were frustrated by personnel officers. (Govt. Exs. 1–C, 3, 3–A–3–C, Tr. pp. 291–295, 302–303, 1977–1978)

35. The District's policy and practice of assigning most black teachers to black schools leads directly to discrimination in hiring when the type of position a particular teacher seeks is open in white schools. No senior high school has a majority black enrollment. None has a faculty over eight percent black. (Govt. Exs. 1, 3, and 8–B)

36. Every principal and every district-wide department head has an absolute, unreviewed veto on applications for positions under their authority; the director of personnel and his chief assistant have absolute veto power over any applicant for any teaching position. There is no review or recordkeeping procedure for determining whether racial discrimination is a factor. The chief personnel officers have broad discretion to reject applicants without sending them on interviews and without making any record of reasons for rejection. Occasionally, personal intervention from the superintendent or other high District officials can reverse a rejection from the personnel department, but even such intervention has not always been successful. (Govt. Exs. 7–C, 8–B, 8–C, 42–A, pp. 19–27, 38, Tr. pp. 13–15, 65–66, 69, 89–95, 202–203, 291–295, 298–302, 837–841)

37. Defendants have been attempting to hire more black teachers. In the past year, 26 of the 150 teachers hired have been black and 19 have been of other minority racial or ethnic backgrounds. However, defendants have not used some readily available techniques for overcoming the effects of past discrimination. The District has never used black persons to recruit teachers. There has never been a black professional employee in the personnel department; there is now one black clerk among eleven employees. The District has not written to placement offices at either predominantly white or predominantly Negro schools indicating its desire to hire qualified teachers with-

out regard to race. (Govt. Exs. 42–A, pp. 35–36, 69, pp. 18, 22–23, Tr. p. 2268)

C. Discrimination in Hiring and Promoting Administrative Personnel.

38. The District has only two black principals, among a total of 37. The record discloses only one other black person who has been a principal. No black person has been a senior high school principal. Two of the senior high schools have each gained a black assistant principal, for the first time since 1968. There is one black assistant principal at the junior high school level, at Washington, and no black principal. There is no black assistant principal at an elementary school. The District has never had a black person at the level of superintendent or assistant superintendent or director of a department. For a period of three years, a black person was director of inter-group education and another black person was a consultant in intergroup education for two years. There has been one black consultant, in reading, for one year; no other consultant in any academic subject has been black. The District's record in the employment of black counselors has been fairly good since approximately 1965; although Mrs. Jeffalyn Johnson experienced difficulty, apparently because of a limit of one black counselor each at schools with large numbers of black students. According to Dr. Jenkins, one purpose of hiring black counselors was to provide training for those individuals to become assistant principals. None of the black counselors became an assistant principal, although numerous vacancies occurred. (Govt. Exs. 3–A–3–C, 4–A–4–C, 42–A, p. 55, 88–L, Tr. pp. 550–551, 556, 2068, 2072)

39. The Court heard testimony from three highly qualified black persons who left the District because of their frustration at being passed over repeatedly for appointments to administrative positions. Ples Griffin, who is now Chief of the Bureau of Intergroup Relations for the State Department of Education in Sacramento could not obtain a position as assistant principal in Pasadena. He was not notified of job openings for which he was qualified, although the District's formal procedures required that he be so notified. Mrs. Minta Palmer, who is about to obtain a doctor's degree in education administration, left the District because she could not obtain that degree from the University of Southern California without administrative experience. Her principal at Madison Elementary School, Mr. Fink, advised her not to attempt to obtain administrative credentials, as he did not think there would be any opportunities for her to advance. She obtained the credentials, but found that Mr. Fink had been accurate in predicting her success; one job for which she was qualified was filled by a white person without her being notified of the vacancy. Other jobs she sought also went to white persons. Mr. Quentin Mason was a counselor, as Mr. Griffin had been. The personnel director advised him on one occasion that he was passed over because he had used abbreviations on a written examination. Dr. Mason had been advised of the examination the day he was to take it. He, like Griffin, tried for over three years to to become an assistant principal before leaving to accept an administrative position elsewhere. Arthur Bias also encountered difficulty in being notified of job vacancies. When Mr. Bias learned of a head coaching job at Muir the principal told him he had already committed himself to giving the job to another, a white coach. Mr. Bias learned that a position at Blair had been open when the white replacement came to ask him for help. (Govt. Ex. 42–A, pp. 28–31, Tr. pp. 726–731, 834–847, 962, 967–972, 1002, 1005–1008)

D. The Effect on Students of Discrimination in Hiring, Assignment, and Promotion.

40. Discrimination in the hiring, assignment, and promotion of black teachers and administrators adversely affects students of all races. Students need examples, in both teaching and administra-

tive positions, of a multi-racial system. Black students need to see that equal opportunities for black teachers exist in order to believe that equal opportunities for black students exist. Additionally, black teachers will have better morale, and therefore do a better job teaching all students if they believe there is equal opportunity for placement and advancement. (Tr. pp. 303, 1066–1069)

## V. CONSTRUCTION

41. Defendants' plans at the time of trial for the construction and rehabilitation of elementary schools, if implemented, will intensify segregation in the District. Particularly, the construction of a new, six-classroom building at the old Arroyo Seco School site would lead to the creation of another white school. Even the construction of a school large enough to accommodate Arroyo Seco and Garfield students, another plan the Board is considering, would result in an abnormally small school, which would do little to relieve segregation of black students (it would have approximately 350 students, 50 of whom would be black). A school with larger capacity would contribute more to integration, but would be unnecessary if the District builds a school of adequate size at Linda Vista. (Govt. Exs. 1; 42–B, Ex. 23–C; and 70, Exs. 2–A and 3)

Defendants presently plan to rehabilitate the Linda Vista Elementary School at its former size, thus leaving it at a capacity of 255 students. At this capacity and at its present location the Linda Vista Elementary School has never enrolled more than 13 black students in any school for which records are in evidence. (Govt. Exs. 1; 14, 42B, Ex. 23C; and 70, Ex. 3)

42. Defendants' plan at the time of trial for desegregation of the junior high schools would, if implemented, impose burdens on black students to a greater extent than on white students. Defendants plan to close Washington Junior High School, principally because, "It is impossible without a great deal of bussing to create any kind of integration at that particular school." This is a non sequitur, as closing Washington would require transportation of all the students normally assigned to that school. Dr. Foster presented a suggestion for an attendance area for Washington that would involve little, if any, additional transportation. What defendants oppose is transporting white pupils to school in a black neighborhood. (Govt. Exs. 1, 10–F, 99–C, 100–B; Def. Ex. W; Tr. pp. 647 and 1863)

43. Defendants have constructed new schools and built additions to existing schools in a manner that has contributed to the racial identifiability of schools in the District.

For example, in 1934 defendants constructed the Cleveland Elementary School on a 2.7 acre site at a capacity of 230 students. The school opened with a high percentage of minority students. Approximately one mile away, defendants maintained Linda Vista Elementary School on a five-acre site at a capacity of 255 students. In 1946–47, the first year ethnic enrollment statistics are available, the enrollment at Cleveland Elementary School was nine Caucasian students, 128 black students and 66 other students. The enrollment at the Linda Vista School during that school year was 170 students, all white. The combined enrollments of these two schools was 373, well below the optimum school size of 600 students which defendants state as their standard for minimum school capacity. (Govt. Exs. 1; 14; 27, p. 44; 68, Exs. 7 and 12; 70, Exs. 2A–2D; and 91)

Between 1956 and 1962 defendants increased the Cleveland Elementary School site from 2.7 acres to 3.9 acres. In 1962 defendants built a ten classroom addition to the Cleveland Elementary School. During the 1962–63 school year the Cleveland School had an enrollment of five Caucasian students, 432 black students, and 48 other students, while the adjoining Linda Vista School had an enrollment of 267 Caucasian students, no black students, and four other students. (Govt. Exs. 1; 14; 68–A, Ex. 12; 70, Ex. 2A; and 88–B)

In 1949, at a time when Caucasian students from the adjoining Garfield Elementary School attendance area were attending Arroyo Seco Elementary School by virtue of the existence of neutral zones, defendants built a one room addition to the Arroyo Seco School. During the 1948–49 school year, the year previous to the addition, Arroyo Seco had capacity for 205 students and a total enrollment of 228 students consisting of 223 Caucasian students, no black students and five other students. During that same year Garfield was under-enrolled, with capacity for 385 students and a total student enrollment of 284 students consisting of 34 Caucasian students, 114 black students and 136 other students. (Govt. Exs. 1; 10–A; 11–L; 14; 70; Ex. 2A; and 88A)

In 1954 defendants constructed a three classroom addition to the Allendale Elementary School. During the 1953–54 school year, the year previous to the addition, the Allendale Elementary School had capacity for 290 students and a total enrollment of 308 consisting of 290 Caucasian students, no black students and 18 other students. The Garfield Elementary School, whose attendance area adjoins that of the Allendale Elementary School was under-enrolled during that same school year with a capacity of 385 students and a total enrollment of 305 students consisting of 37 Caucasian students, 153 black students and 115 other students. (Govt. Exs. 1; 14; 49–A; 49–B; and 70, Ex. 2A; Tr. pp. 599–602)

Defendants maintain that the appropriate capacity of an elementary school should be 600 students. Nevertheless, defendants have constructed and maintained Arroyo Seco Elementary School, Linda Vista Elementary School, and Noyes Elementary School with 11 or fewer classrooms, and capacities of less than 350, and with student enrollments over 90 percent white. Until 1962 defendants maintained the Cleveland Elementary School at a size of eight classrooms with a predominantly black student enrollment. (Govt. Exs. 1; 27, p. 44; and 70, Exs. 2A–2D)

44. Defendants have placed transportable classrooms at Negro schools to accommodate over-enrollment at those schools while adjoining white schools had either fewer transportables or no transportables in the same school years.

Each year since 1961–62, Washington Elementary School has had at least three, and since 1966 at least ten, transportable classrooms on its grounds. The two majority white schools with adjacent attendance areas, Altadena and Longfellow, had no transportables from 1961–62 until 1969–70, when Longfellow received three (Washington has ten; Altadena has none). Similarly, predominantly black Cleveland School had transportables from 1960 until its addition opened in 1963, and predominantly black Jackson has had transportables every year since 1960 (six each year since 1964). Nearby, white Linda Vista had no transportables until 1969, when structural deficiencies required the use of four transportables. Linda Vista has the lowest pupil load, per site acre of any school in the District, with the exception of Noyes. A comparable situation has existed with Madison School, now 64 percent black, having between two and nine transportables each year since 1960. Nearby McKinley (11 percent black this year) has had no transportables, while Jefferson (six percent black) had none until 1964, and then only one per year until 1969–70, when it added 14 transportables due to structural difficulties with the main building. (Govt. Exs. 1; 10–F; 13–C; 14; and 70, Exs. 2–A through 2–D)

45. Defendants have maintained schools with student enrollment that are minority Caucasian under capacity while adjoining schools that are predominantly Caucasian are over-enrolled.

Since 1961–62 predominantly white Allendale Elementary School had been maintained over capacity. Garfield Elementary School, whose attendance area adjoins the attendance zone of the Al-

lendale School has been under-enrolled in each school year since the 1961–62 school year. Defendants have failed to fill vacancies at Garfield with Caucasian students from Allendale. (Govt. Exs. 1, 10–F, 14, and 70, Exs. 2A–2B)

Defendants are currently maintaining Washington Junior High School, predominantly black in enrollment, at an enrollment level that is under the school's capacity by approximately 94 students. Defendants also maintain predominantly Caucasian Marshall Junior High School, whose attendance area adjoins Washington Junior High School's attendance zone, at over-capacity by approximately 90 students. Defendants have failed to assign white students attending Marshall to fill the vacancies existing at Washington Junior High School. (Govt. Exs. 1, 10–J, and 42B, Ex. 25)

During each year for which records are in evidence (1961–62 to the present), defendants have operated Pasadena High School over its capacity, while Muir High School has in each of those years been under-enrolled (Govt. Exs. 1, 42–B, Exs. 23–A, 23–B, 23–F, and 23–H). (Govt. Exs. 1; 11–H; 42B, Ex. 25; 68–A, Ex. 12; 70, Ex. 2–C)

## VI. INTERCLASS GROUPING

46. The District has two systems of grouping students that are in general use. At the elementary level, students identified as gifted are placed in classes with children who test at average to superior achievement levels, while students identified as below average academically are placed together with average and above average achievers. At the secondary level, students are grouped in "fast," "regular," and "slow" classes in English, social studies, science, and mathematics. (Govt. Exs. 27, pp. 7, 8; 29; 30; 33–A and 33–B; Tr. p. 1700)

In 1969, officials of the District began to permit variations in types of grouping. Three elementary schools have no groupings, and five of the secondary schools have begun to experiment with heterogeneous grouping procedures in some subjects. (Govt. Exs. 27, pp. 15, 16; and 53; Tr. p. 1838)

47. The racial effect of the grouping procedures generally in use in the District is to increase segregation. At every secondary school a higher percentage of black than white students is in slow classes in every subject matter, and a higher percentage of white than black students is in fast classes. At some schools, the segregation is extensive. At McKinley Junior High School, for example, 52 percent of the white children in science are in fast classes, while two percent are in slow classes; 31 percent of the black children in science are in slow classes and one percent are in fast classes. Even in social studies the segregation is pronounced; 48 percent of the while children and five percent of the black children are in fast classes; 38 percent of the black children and six percent of the white children are in slow classes. Even at the elementary level, where the grouping procedures are most flexible, the racial effects are pronounced. Seventy-five percent of the white students attend classes with gifted students, while 60 percent of the black students do not. (Govt. Exs. 27, p. 32; 53 and 54)

48. The racial segregation that exists within integrated schools as a result of interclass grouping doubtless has numerous causes, not all of which are treated in the record. Three causes do appear in the record, each of which involves elements of racial discrimination. One is that grouping assignments are based in part on scores obtained on achievement and "intelligence" tests. As the District's assistant superintendent for elementary education acknowledged, such tests are racially discriminatory, based as they are primarily on verbal achievement. Another factor is that grouping assignments are based in part on teacher and counselor recommendations. The evidence shows that at least at some schools there is a tendency among some counselors and other school personnel to assume that Negro students, particularly

Negroes of poor socio-economic backgrounds, will achieve poorly and to make low assignments accordingly. A third factor is that it is the District's policy, at least in elementary schools, to make higher placements than would otherwise be made simply because a parent requests higher placement. This policy favors children of assertive parents. In Pasadena, at least, white parents as a group tend to be more assertive than black parents. (Govt. Exs. 27, pp. 9, 10, 12, 16, 21, 22; Tr. pp. 96, 97, 117, 118, 516–520, 537–541, 553, 554, 1076–1078, 1658–1661)

## VII. TRANSFERS

49. Defendants have granted transfers that they knew or should have known were wholly or at least in part motivated by racial considerations, including baseless transfers that had the effect of intensifying racial segregation in the Pasadena schools.

50. Mr. Rex Ratcliffe filled out a transfer application stating in the blank labeled "(S)school pupil desires to attend," the statement, "(A)ny where colored population is not in majority." He lives in the Washington zone. Although the principal of Longfellow Elementary School recommended that the transfer not be granted, defendants nevertheless granted Mr. Ratcliffe's two children transfers from Washington Elementary School to Longfellow Elementary School. (Govt. Exs. 1, 76–A and Supp.)

Mr. and Mrs. Wayne Stone filled out an application for their daughter Beverly to transfer from predominantly black Washington Junior High School to predominantly Caucasian Marshall Junior High School. As reason, they stated in part, "Please do not tell us that because of ethnic balance she cannot have a permit. I'm (we) sure one child is not going to make any difference. Would you send yours there under present conditions?" Defendants granted Beverly Stone the transfer. (Govt. Exs. 1 and 76–B)

Defendants have granted numerous transfer permits to white students to leave Washington Junior High School on the basis of fear or fights or the alleged bad condition of the school. (Govt. Exs. 80–A, 80–B, and 80–C)

51. The record reflects that the most frequently abused types of transfers are those for child care at the elementary level and for student's change of residence at the secondary level. (See Govt. Exs. 1; 67, Exs. 4 and 5; 78; 79–A, and 79–C; Tr. pp. 934, 948–950, 1033, and 1728–1729)

52. In addition, defendants have granted "hardship" and other miscellaneous transfers that had obvious racial effects, such as a "hardship" transfer to Marshall based chiefly on the fact a forceful father had enrolled his son there without a transfer. Another "hardship" transfer, to Longfellow, was "emphatically" opposed by the receiving principal, but granted by the assistant superintendent, in part because "all children in the area go to Longfellow." Another student who had enrolled without a permit at a white school outside his zone, Pasadena High School, was permitted to stay to take photography at Pasadena. Muir, the school serving his residence, has a photography course. (Govt. Exs. 1; 67, Ex. 10; 77; 79–B; Tr. pp. 937–945, 1527, and 1848)

53. Defendants adopted a policy of open transfers on July 30, 1968, whereby a student can transfer from the school of his normal attendance area if the transfer will improve ethnic balance in both the sending and receiving schools. However, such transfers are granted only to schools where space is declared available. Only four elementary schools meet these criteria. Three of these schools are in the far eastern portion of Pasadena—Don Benito Elementary School, Field Elementary School and Willard Elementary School—and are not easily accessible to the black students residing in the western portion of the city. To obtain a transfer to one of those schools, a child must provide his

own transportation. The fourth receiving school is Cleveland Elementary School which has a 97.4 percent black student enrollment.

While permitting ethnic balance transfers only to schools at the edges of the District, defendants have permitted other intra-district transfers to such schools as Altadena, Longfellow and Jefferson. In fact, those three schools alone received a total of 140 transfer students in 1969–70. (Govt. Exs. 1; 10–F; 14, 35; 42B, Ex. 31)

54. The Court finds that although there have been abuses of the school district's transfer policies no injunction concerning transfers is necessary at this time, because of the integration to be required by commencement of the 1970–71 school year.

## CONCLUSIONS OF LAW

### I

### ORIGINAL CONCLUSIONS

1. In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court was dealing, simply, with racial segregation. The Court made no distinction as to Northern segregation or Southern segregation. The Supreme Court held, simply, that segregated education is inherently unequal that it deprived Negro children of the educational opportunity to fulfill all their dreams in this country. It further held that all children are deprived, in a constitutional sense, by segregation.

■ 2. Under the facts of this case, use of a strict neighborhood school policy and a policy against cross-town bussing take on constitutional significance as a violation of the Fourteenth Amendment to the Constitution of the United States.

### II

### SUPPLEMENTARY CONCLUSIONS

3. This court has jurisdiction of this action under 28 U.S.C. §§ 1343 and 1345.

■ 4. Pursuant to the Fourteenth Amendment, and Title IV of the Civil Rights Act of 1964, this court had jurisdiction to hear and to decide all issues concerning alleged racial discrimination in public education in the Pasadena Unified School District, including policies with respect to assignments and transfers of students, the allocation of faculty and staff, and the location and construction of schools. United States v. School District 151, 286 F.Supp. 786 (N.D.Ill., 1968), affirmed, 404 F.2d 1125 (7th Cir. 1968), United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), affirmed en banc, 380 F.2d 385 (5th Cir. 1967), cert. denied, Caddo Parish School Bd. v. U. S., 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala., 1967), affirmed, Wallace v. U. S., 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

■ 5. The chief significance of Brown is its holding that racially segregated public education is detrimental to school children. 347 U.S. at 494, 74 S.Ct. at 686, 98 L.Ed. at 880. See United States v. Jefferson County Board of Education, 372 F.2d 836, 846, 868 (5th Cir. 1966). Under the Fourteenth Amendment a public school body has an obligation to act affirmatively to promote integration, consistent with the principles of educational soundness and administrative feasibility.

■ 6. A violation of the Fourteenth Amendment has occurred when public school officials have made a series of educational policy decisions which were based wholly or in part on considerations of the race of students or teachers and which have contributed to increasing racial segregation in the public school system. Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833, 837 (E.D.La., 1967), affirmed, 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 652 (E.D.La., 1961), affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962); United States v. School District 151, *supra*, 404 F.2d at 1134; Taylor v. Board

of Education, 191 F.Supp. 181 (S.D.N.Y., 1961), affirmed, 294 F.2d 36 (2nd Cir. 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Griffin v. County School Board, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

7. When school officials consistently draw attendance lines so as to increase racial segregation, the presumption arises that they have done so to promote racial segregation of students, in violation of the Constitution. United States v. School District 151, supra, 286 F.Supp. at 798.

8. School officials have an obligation to correct the effects of improperly drawn attendance zones. Taylor v. Board of Education, 294 F.2d 36 (2nd Cir. 1961); c.f. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

9. A school board may not, consistently with the law and the Fourteenth Amendment, use a neighborhood school policy as a mask to perpetuate racial discrimination. Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 166 (10th Cir. 1967), cert. denied, 387 U.S. 931, 87 S. Ct. 2054, 18 L.Ed.2d 993 (1967); United States v. School District 151, supra, 286 F.Supp. at 798.

10. School boards may not build upon residential segregation, when that segregation is the result of either private or state enforced discrimination. Brewer v. School Board of City of Norfolk, 397 F.2d 37, 42 (4th Cir. 1968). Defendants have a duty to attempt to overcome the effects of residential segregation on student assignments. "Assignment of pupils to neighborhood schools is a sound concept, but it cannot be approved if residence in a neighborhood is denied to Negro pupils solely on the grounds of color." Id. at 42; United States v. School District 151, supra, 286 F.2d at 798. See also, Green v. County School Board, 391 U.S. 430, 442, 88 S.Ct. 1689, 20 L.Ed.2d 716, 726.

11. The existence of residential segregation based upon discrimination may be inferred from evidence of the existence and enforcement by courts in the past of racially restrictive covenants. It may be inferred from testimony that there are significant areas of a community in which black persons do not and have not resided. It may be inferred from testimony that realtors have not sold, or have been reluctant to sell, houses in certain areas of the community to Negroes. Dowell v. School Board of Education of Oklahoma City Public Schools, 244 F.2d 971, 980 (W.D.Okl. 1965), affirmed, 375 F.2d 158 (10th Cir. 1967).

12. When from the evidence it appears that racial discrimination has led to residential segregation and that the residential segregation is reflected in school enrollment figures, school officials have the burden to show that there are no educationally sound and administratively feasible alternatives available to overcome the existence of segregated schools. United States v. School District 151, supra, 286 F.2d at 798.

13. When school officials have located new schools and constructed additions to old schools, and have failed to adjust school enrollments to fit school capacities in such a way as to intensify racial segregation, they have the affirmative duty "to *seek* means to eradicate" the results of their discriminatory acts. United States v. Board of Public Instruction of Polk County, Florida, 395 F.2d 66, 69 (5th Cir. 1968) (emphasis in original); Lee v. Macon County Board of Education, 267 F.Supp. 458, 472, and 480 (M.D.Ala.1967).

14. Defendants' desegregation plans based primarily on the choice of students and their parents have been inadequate to meet defendants' Fourteenth Amendment obligations, as more effective methods of reducing segregation in both majority black and majority white schools have been available. Green v. County Board of Education, *supra*; Adams v. Mathews, 403 F.2d 181, 189 (C.A. 5, 1968).

15. Recruitment and assignment of public school faculty and pro-

fessional staff personnel, including classroom teachers, principals, and substitute teachers, on a racial basis, so as to establish schools that are racially identifiable by the composition of their faculties, deprive students of the right to be free of racial discrimination in the operation of public schools, in violation of the Fourteenth Amendment. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716, 722 (1968). "Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion or rehiring, on the ground of race or color." Stell v. Board of Education for City of Savannah, 387 F.2d 486, 497 (5th Cir. 1967).

█ 16. Discrimination on the basis of race in the hiring of public school faculty and professional staff personnel deprives students of the right to be free of racial discrimination in the operation of public schools, in violation of the Fourteenth Amendment. United States v. Jefferson County Board of Education, 372 F.2d 836, 893 (5th Cir. 1966). "It is essential that school officials (1) cease practicing racial discrimination in the hiring and assignment of *new* faculty members, and (2) take affirmative programmatic steps to correct existing effects of past racial assignment." *Id.,* (emphasis in original).

█ 17. The defendants' present obligation, in order to overcome the effects of prior discrimination, is to allocate faculty and professional staff members so that no school is identifiable, by the racial composition of its faculty, as being tailored for a heavy concentration of black or white students. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed. 2d 263 (1969); United States v. Jefferson County Board of Education, 380 F.2d 385, 394 (5th Cir. 1967); Brewer v. City of Norfolk School Board, 397 F.2d 37, 39 (4th Cir. 1968).

█ 18. The responsibility for faculty and staff desegregation is that of the defendants, not the teachers, and the achievement of the required objective may not be made contingent upon the willingness of teachers voluntarily to transfer from their present schools. If necessary, faculty and professional staff members shall be assigned or reassigned to schools in order to comply with this requirement. United States v. Board of Education of City of Bessemer, 396 F.2d 44, 50–51 (5th Cir. 1968); Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690, 695, 697, 698 (5th Cir. 1968); United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 at 1093–1094 (5 Cir. 1969); Monroe v. Commissioners of City of Jackson, 380 F.2d 955, 960 (6th Cir. 1967), rev'd on other grounds, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Kelley v. Altheimer, 378 F.2d 483, 498–499 (8th Cir. 1967).

█ 19. A school board may not, consistently with the Fourteenth Amendment, maintain segregated schools because of, or permit educational choices to be influenced by, a policy of racial segregation in order to accommodate community sentiment or the wishes of a majority of voters. Cooper v. Aaron, 358 U.S. 1, 12–13, 15–16, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Hall v. St. Helena Parish School Board, 197 F. Supp. 649, 659 (E.D.La.1961), affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1961); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700 (1968); United States v. School District 151, supra, 286 F.Supp. at 798.

█ 20. The present constitutional obligation of school authorities who have caused and intensified racial segregation

**524**

in a school system, in violation of the Fourteenth Amendment "is to come forward with a plan (of desegregation) that promises realistically to work, and promises realistically to work *now*." Green v. County School Board, supra, 391 U.S. at 439, 88 S.Ct. at 1694, 20 L.Ed.2d at 724. The right to an equal educational opportunity is of "paramount importance," and delays in vindicating that right are intolerable. Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1969); Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (January 20, 1970).

21. School officials are obliged under the Fourteenth Amendment to attempt to make an equitable distribution of the teachers and administrators with experience and advanced training. By assigning teachers with less experience and training to schools with predominantly black enrollments, defendants have denied equal protection of the laws to students in those schools. Kelley v. Altheimer, 378 F.2d 483, 499 (8th Cir. 1967).

22. 42 U.S.C. Sec. 2000c–6(a) as it relates to the power of courts and officials to require transportation of pupils to overcome racial imbalance in public schools, must be construed to relate to so-called de facto or adventitious segregation. That provision is inapplicable in this case where the existing segregation of pupils and teachers is inseparable from the discriminatory practices and policies of the defendants. United States v. Jefferson County Board of Education, 372 F.2d 836, 878–886 (5th Cir. 1966); United States v. School District 151, 404 F.2d 1125, 1130–1132 (7th Cir. 1968).

23. By requiring that students from two majority black residential areas, the Open District and the Audubon area, be transported to achieve integration, while not transporting children from majority white residential areas to achieve integration, defendants have placed an undue share of the burdens of desegregation on black children and, thus,

have violated the Fourteenth Amendment. Cf. Brice v. Landis, No. 51805, N.D.Cal., August 8, 1969; Quarles v. Oxford Municipal Separate School District, C.A. No. WC6962-K, January 7, 1970.