306 F.3d 646
 Sylvia SCOTT, as Guardian Ad Litem for minors, Detrick Standmore, Kayla Hunter, Michaela Reyes & Ronald Rucker; Rene Amy, as Guardian Ad Litem for minors Camdem Rene Amy & Mariss Laraine Amy; George Francis MacPherson, as Guardian Ad Litem for minor, George Gordon MacPherson; Silvia Jimenez MacPherson, as Guardian Ad Litem for minor George Gordon MacPherson; Romeo Alva, as Guardian Ad Litem for minor, Jocelyne Alva, Plaintiffs-Appellees-Cross-Appellants,
v.
PASADENA UNIFIED SCHOOL DISTRICT; George Van Alstine; George Padilla; Jacqueline Jacobs; Bonnie Armstrong; Lisa Fowler; Vera Vignes, in their individual and official capacities, Defendants-Appellants-Cross-Appellees.
 No. 00-55532.
 No. 00-55666.
 No. 00-55789.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 17, 2001.
 Filed September 4, 2002.
 
 COPYRIGHT MATERIAL OMITTED Kevin T. Snider, Springfield, MO, for the appellants.
 Patricia A. Brannan, Washington, DC, for the appellees.
 Appeal from the United States District Court Central District of California; Dickran Tevrizian, District Judge, Presiding. D.C. No. CV-99-01328-DT.
 Before: B. FLETCHER, D.W. NELSON, and McKEOWN, Circuit Judges.
 BETTY B. FLETCHER, Circuit Judge.
 
 
 1
 This action arises out of a state and federal constitutional challenge brought by parents Sylvia Scott, René Amy, George Gordon MacPherson, Silvia Jimenez MacPherson, and Romeo Alva (collectively "Scott"),[1] serving as guardians ad litem on behalf of eight minor student plaintiffs[2] enrolled in the Pasadena Unified School District ("PUSD," or the "District"), against the District's 1999-2000 admissions policy governing three voluntary schools. The challenged policy permits race and gender, in addition to other factors, to be taken into account under special circumstances during an admissions lottery. Defendants to the action comprise PUSD, individual members of the PUSD's Board of Education (the "Board"),[3] and PUSD Superintendent, Vera Vignes.
 
 
 2
 Plaintiff-appellees allege that PUSD's use of race as an admissions factor violated both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 31 of the California Constitution. In addition, plaintiffs allege that they are entitled to damages under California Civil Code § 52 (the "Unruh Act"). PUSD now appeals the district court's order granting summary judgment in favor of plaintiffs' federal and state constitutional claims and denying PUSD's cross-motion for summary judgment on the grounds that the plaintiffs lack Article III standing. Plaintiffs cross-appeal the district court's dismissal of their state law damages claim.
 
 
 3
 We reverse the order of the district court granting summary judgment for the plaintiffs and dismiss all of plaintiffs' claims for failure to establish Article III standing.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 A. Factual Summary
 
 4
 This case concerns PUSD's use of weighted lotteries in its magnet school admissions process in an effort to improve the fairness of voluntary pupil assignments and to maintain student body diversity, without sacrificing eligibility for state and federal desegregation funding. In January 1970, PUSD received the dubious distinction of being the first non-Southern school district to be placed under a consent decree by a federal district court in order to remedy de jure racial segregation within its public school system. Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501 (C.D.Cal.1970). The court's injunction resulted in a radical restructuring of school attendance zones throughout the city, known as the Pasadena Plan.
 
 
 5
 The injunction lasted for nine years until PUSD was declared unitary and released from judicial supervision by order of this court. 611 F.2d 1239 (9th Cir.1979). We overruled the district court's exercise of its equitable discretion to maintain jurisdiction over the District's integration plan based in part upon the Board's "representations that it would continue to engage in affirmative action in the future in support of integration." Id. at 1241. As a result, PUSD formed its first voluntary integration plan in 1980, updating the plan twice in the 1990s to respond to demographic shifts in the district's population.
 
 
 6
 Consistent with its goal of providing an integrated public education environment, PUSD currently operates three magnet, or voluntary, schools: Don Benito Fundamental School ("Don Benito") including students in grades kindergarten through five, Norma Coombs Alternative School ("Norma Coombs") including students in grades kindergarten through eight, and Marshall Fundamental School ("Marshall") including students in grades six through twelve. Although every PUSD student is assigned to a neighborhood school, a student may also apply voluntarily to one or more of the voluntary schools, so long as the individual school's curriculum covers the student's present grade. The opportunity for superior academic performance and special resources make admission to the voluntary schools desirable for students who are willing to forgo the convenience of attending neighborhood schools.
 
 
 7
 On March 24, 1998, the Board approved its Integration Policy and Quality Schooling Plan, thereby amending Board Policy 0460.[4] According to the policy, the Board instituted a lottery system for assigning students to the voluntary schools, to be used only if a school received more applications than it had available spaces.[5] The Board amended its voluntary admissions procedures in response to complaints from parents who were previously required to wait in line in order to secure a place for their children on a "first come, first served" basis. When the number of students applying for admission to any particular voluntary school exceeded the number of available spaces, the policy first gave priority to siblings of students already enrolled at the school. If spaces remained available after siblings had been admitted, any remaining unassigned students were to be chosen through a computerized lottery.
 
 
 8
 Once the Board determined that a lottery was appropriate with regard to any particular school, the policy would permit PUSD to weigh gender, race or ethnicity, socioeconomic status, language, and special needs as factors within the lottery process for admission to that school. According to the policy, these factors could only be considered "when necessary to create an integrated setting." Board Policy 0460(d) ¶ 8. The use of these factors was further restricted to the selection of students for the entering grades of each voluntary school.
 
 
 9
 Parents were informed of the amended policy by a letter from Superintendent Vignes, dated November 30, 1998. The amended policy was to go into effect beginning with applications submitted in the spring of 1999 for the 1999-2000 school year. The Board provided a three-month window for the submission of applications, opening on January 4, 1999, and closing on March 12, 1999.
 
 
 10
 In February 1999, before the revised admissions policy had been implemented at any voluntary school, Vignes presented a report to the Legislative Council of the California Legislature, documenting the use of state-provided, voluntary desegregation funding by PUSD. The report was required by state law governing the use of desegregation funding.[6] In order to maintain eligibility for state voluntary desegregation funding, PUSD was required to demonstrate how programs receiving funding worked both to alleviate the harmful effects of racial segregation and to improve student academic performance.[7]
 
 
 11
 In her report, Vignes recounted the District's history of judicial supervision and proclaimed the District's continuing obligation to integrate its public schools. In addition, Vignes presented statistical showings that PUSD's voluntary schools, as well as other schools receiving desegregation funding to support their student transportation programs, consistently out-performed schools that based their enrollment strictly on neighborhood attendance zones. Finally, Vignes represented the lottery system for voluntary school admission as a new amendment to PUSD's longstanding integration policy, furthering the District's effort to comply with state funding requirements.
 
 
 12
 On April 7, 1999, PUSD conducted lotteries for two of the three voluntary schools, Don Benito and Norma Coombs. Marshall High School, which did not run a deficit of available spaces in 1999, admitted all student applicants without resorting to a lottery. The two minor plaintiffs (Kalya Hunter and Michaela Reyes) who applied to Marshall were admitted for the 1999-2000 school year. In addition, three plaintiffs (Jocelyne Alva, Ronald Rucker, and Detrick Standmore) did not apply to any voluntary school for the 1999-2000 academic cycle.
 
 
 13
 No minor plaintiff applying to either Norma Coombs or Don Benito was subjected to a lottery process that used race, ethnicity, gender or any other student characteristic as a factor because the applicant pools were determined to be broadly representative of the District's overall student population.[8] Two minor plaintiffs (Camden René Amy and Marissa Laraine Amy) applied to Norma Coombs, but they simultaneously informed PUSD that they intended to attend Woodrow Wilson Middle School if that school was able to assemble its International Baccalaureate Program. Because the aforementioned program was established for the 1999-2000 school year, their applications were withdrawn from Norma Coombs. Finally, the remaining minor plaintiff (George MacPherson) applied to Don Benito, was included in the lottery process held in April 1999, and was not selected.
 
 B. Procedural History
 
 14
 Scott filed the first amended complaint in this case on March 29, 1999. PUSD responded with a motion to dismiss, arguing that Scott lacked standing to challenge the lottery process. The district court denied that motion, concluding that dismissal based on lack of standing was premature, but providing the defendants leave to pursue the issue at summary judgment. In August 1999, the parties entered an agreement to take limited discovery prior to summary judgment, providing for a second discovery phase if summary judgment was not dispositive.
 
 
 15
 On December 7, 1999, the defendants filed a motion for summary judgment, again alleging that the plaintiffs lacked Article III standing. Scott filed a cross-motion for summary judgment on all claims, except the damages claim under the Unruh Act.
 
 
 16
 The district court denied the defendants' motion, holding that the revised lottery provisions of the policy constituted a denial of equal treatment sufficient to satisfy the injury-in-fact requirement for Article III standing. The court further held that "whether or not Plaintiffs actually suffered racial discrimination is immaterial" because the plaintiffs were "ready and able" to apply to the voluntary schools in the future and "a discriminatory policy prevented [them] from doing so on an equal basis." Mem. Order (Feb. 7, 2000) at 12. The court concluded that "[t]he language of BP 0460(d)(8), render[ed] untenable Defendants' position that places were assigned in a race-, ethnic-, or gender-neutral manner," because, in order to determine whether an adjustment of the random lottery process is necessary to promote integration, the Board must "always keep[] an eye on the applicant pool to make sure it is a fair representation of the PUSD's racial, ethnic or gender makeup as a whole." Id. at 15. The defendants currently appeal the district court's denial of their motion for summary judgment as well as its grant of summary judgment for the plaintiffs.
 
 
 17
 Although the court issued an injunction against future enforcement of BP 0460(d) ¶ 8 to the extent that it considered race, ethnicity, or gender, it did not invalidate the results of the 1999 admissions process. Following the court's filing of its order on February 7, 2000, PUSD suspended enforcement of the policy. PUSD took this action before making any pupil assignments for the 2000-2001 school year.
 
 
 18
 On March 20, 2000, the district court issued an order sua sponte dismissing Scott's claims for damages under the Unruh Act for failure to state a claim. Scott currently appeals the district court's dismissal of the state law damages claim.
 
 II. STANDARD OF REVIEW
 
 19
 We review the district court's order granting summary judgment de novo. See Clicks Billiards Inc. v. Sixshooters, Inc., 251 F.3d 1252 (9th Cir.2001); Robi v. Reed, 173 F.3d 736, 739 (9th Cir.1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In reviewing summary judgment, we "must determine whether the evidence, viewed in a light most favorable to the nonmoving party, presents any genuine issues of material fact and whether the district court correctly applied the law." Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996); see also Pomerantz v. County of Los Angeles, 674 F.2d 1288, 1290 (9th Cir. 1982) (holding that the same standard applies for review of denial of summary judgment).
 
 
 20
 Because "[a] district court's decision to grant a permanent injunction involves factual, legal, and discretionary components," we evaluate such a decision under three different standards of review. Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir.1998). We review the district court's legal conclusions de novo. Id. Any factual findings supporting the decision to grant the injunction will be reviewed for clear error. Id. We review the scope of the injunction for abuse of discretion. Id. However, the district court may not rely on factual findings made incident to the issuance of a permanent injunction when deciding a motion for summary judgment. See Fed. R.Civ.P. 52(a) (stating that findings of fact are unnecessary on decisions of motions under Rule 56); Rand v. Rowland, 154 F.3d 952, 957 n. 4 (9th Cir.1998) (en banc) (stating that "[a] district court does not, of course, make `findings of fact' in ruling on a summary judgment motion" (internal quotation marks and citation omitted)); Bothke v. Fluor Eng'rs & Constructors, Inc., 834 F.2d 804, 810 (9th Cir.1987) (stating that the "district court was not entitled to make findings of fact" at summary judgment and holding, therefore, that a prior panel in the same case "erred in applying the `clearly erroneous' test of Fed.R.Civ.P. 52(a)"); see also Country Floors v. P'Ship of Gepner & Ford, 930 F.2d 1056, 1062 (3d Cir.1991) (holding that factual determinations made in ruling on a motion for a preliminary injunction cannot be used to decide summary judgment).
 
 III. DISCUSSION
 
 21
 The district court found that Scott had standing to bring a federal equal protection challenge against the District's voluntary school admissions policy. The court then ruled that the policy's authorization of the use of race, as an admissions factor in certain circumstances, violated the test of strict scrutiny under the Equal Protection Clause, U.S. Const. amend. XIV, § 1; Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor ... are constitutional only if they are narrowly tailored measures that further compelling governmental interests"), and similarly violated state constitutional law, Cal. Const. art. I, § 31. The court also ruled that the policy's authorization of the use of gender as an admissions factor violated equal protection, by failing to satisfy the test of intermediate scrutiny, Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that gender classifications "must serve important governmental objectives and must be substantially related to those objectives"), and similarly violated state law.
 
 
 22
 The defendants continue to challenge standing on appeal. We conclude that the mere existence of the admissions policy, standing alone, is insufficient to satisfy the requirement of Article III standing and that, therefore, we lack jurisdiction over Scott's state and federal claims.
 
 A. Article III Standing
 
 23
 We must establish jurisdiction before proceeding to the merits of the case.[9] "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it. And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it." Arizonans for Official English v. Arizona, 520 U.S. 43, 73, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (internal quotation marks and citations omitted); accord Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The federal courts are "courts of limited jurisdiction that have not been vested with unlimited open-ended lawmaking powers." Northwest Airlines, Inc. v. Trans. Workers, 451 U.S. 77, 95, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Rather, our jurisdiction is circumscribed by the "case or controversy" requirement of Article III standing and by prudential considerations, such as ripeness,[10] that arise as we navigate constitutional limitations on our judicial power. U.S. Const. art. III; Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); see also Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138-42 (9th Cir. 2000) (en banc) (discussing the constitutional and prudential elements of the standing and ripeness doctrines).
 
 
 24
 The requirement of Article III standing is a core component of the separation of powers. See Citizens for a Better Env't, 523 U.S. at 101, 118 S.Ct. 1003; Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The standing doctrine aids the federal judiciary to avoid intruding impermissibly upon the powers vested in the executive and legislative branches, by preventing courts from issuing advisory opinions not founded upon the facts of a controversy between truly adverse parties. United Public Workers v. Mitchell, 330 U.S. 75, 89-90, 67 S.Ct. 556, 91 L.Ed. 754 (1947).
 
 
 25
 In order to establish standing, a plaintiff must first show that she has suffered an "`injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted). Second, the injury must be "fairly traceable to the challenged action of the defendant." Id. (internal quotation marks omitted). Third, "it must be `likely,' as opposed to merely `speculative,'" that the injury is remediable by appropriate court action. Id. at 561, 112 S.Ct. 2130.
 
 
 26
 In an action challenging the constitutionality of racial and gender classifications,[11] the defendant bears the ultimate burden of proving that the classifications satisfy strict and intermediate scrutiny respectively. See Richmond v. J.A. Croson Co., 488 U.S. 469, 505, 509-11, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (discussing strict scrutiny); United States v. Virginia, 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (discussing intermediate scrutiny). However, before the burden shifts to the defendant to make such a showing, the plaintiff must first satisfy her burden of demonstrating that she has standing to make the constitutional challenge. Adarand, 515 U.S. at 210-11, 115 S.Ct. 2097. The burden of establishing Article III standing remains at all times with the party invoking federal jurisdiction. Lujan, 504 U.S. at 561, 112 S.Ct. 2130; see also Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.").
 
 
 27
 Our principal task is to determine whether Scott faces "a realistic danger of sustaining a direct injury as a result of the [policy]'s operation or enforcement," Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), or "whether the alleged injury is too `imaginary' or `speculative' to support jurisdiction," Thomas, 220 F.3d at 1139 (citing Babbitt, 442 U.S. at 298, 99 S.Ct. 2301). We must consider the facts as they existed at the time that the complaint was filed. Clark v. City of Lakewood, 259 F.3d 996, 1006 (9th Cir. 2001); see also Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."); accord Lujan, 504 U.S. at 570 n. 4, 112 S.Ct. 2130. Scott filed her first amended complaint roughly one week before PUSD conducted lotteries for admission to Don Benito and Norma Coombs in April of 1999. Because the lottery provision of the District's integration policy had never been executed before that time, Scott could not have known (1) whether the racial or gender provisions of the policy would be applied, (2) how they would be applied, or (3) whether any of the individual plaintiffs would be disadvantaged by their application (as opposed to actually receiving admission to a voluntary school because race or gender were taken into account).[12] Of course, when the District subsequently conducted the lotteries, race was not considered as an admissions factor.
 
 
 28
 As the Supreme Court stated in Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness," id. at 190, 120 S.Ct. 693. The present case represents one such circumstance. Because PUSD discontinued its use of the weighted lottery system in response to a court order,[13] the possibility of future injury is not speculative enough to establish mootness. Nevertheless, it is too weak to support standing.
 
 
 29
 "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir.1983); Western Mining Council v. Watt, 643 F.2d 618, 627 (9th Cir.1981); see also Thomas, 220 F.3d at 1139 (stating that "neither the mere existence of a prospective statute nor a generalized threat of prosecution satisfies the `case or controversy' requirement."). A plaintiff must satisfy the injury-in-fact requirement by alleging that she "has suffered `some threatened or actual injury resulting from the putatively illegal action.'" O'Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). A plaintiff may allege a future injury in order to comply with this requirement, but only if he or she "is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury is both real and immediate, not conjectural or hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (internal quotation marks and citations omitted).
 
 
 30
 An action will be moot only if "[a] determination ... of the legal issues tendered by the parties is no longer necessary to compel ... and could not serve to prevent" the action from which one party seeks relief. DeFunis v. Odegaard, 416 U.S. 312, 317, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); see also Allard v. DeLorean, 884 F.2d 464, 466 (9th Cir.1989) (stating that a federal court has no jurisdiction to hear a case that cannot affect the litigants' rights). Here, a ruling on the merits might still impact the rights of individual plaintiffs who remain eligible to apply to PUSD voluntary schools at some future date. Some of Scott's claims, in other words, remain redressable and, therefore, are not moot. DeFunis, 416 U.S. at 317, 94 S.Ct. 1704.
 
 
 31
 Eligibility to apply for a permit to a voluntary school for minor plaintiffs Alva, Amy, Hunter, Larraine, Reyes, and Rucker has ended during the life of this litigation. These plaintiffs are now no longer able to satisfy the redressibility requirement of Article III standing, and, as a result, their claims are now moot.[14] Minor plaintiffs Standmore and MacPherson remain eligible to apply to PUSD's voluntary schools in the future.[15] Therefore, claims brought on behalf of these two plaintiffs are not moot.
 
 
 32
 Scott's claim that the policy denies her equal protection of the laws properly alleges an invasion of a legally protected interest, and that interest is "particularized" as to individual plaintiffs who remain eligible to apply to PUSD's voluntary schools.[16] However, Scott cannot establish the standing of any individual plaintiff without demonstrating a "genuine threat" of adverse treatment due to the policy's imminent enforcement, Stoianoff, 695 F.2d at 1223, and she has failed to concretely establish that any specific harm will likely befall any specific plaintiff. As stated above, Scott has provided no evidence tending even to show that a particular plaintiff will not be benefitted rather than harmed by the defendant's future implementation of the challenged provisions of the admissions policy.
 
 
 33
 In Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), the Supreme Court held that "`injury in fact' in an equal protection case ... is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Id. at 666, 113 S.Ct. 2297. Scott has misconstrued this statement to mean that the hypothetical existence of a racial or gender barrier is enough, without a plaintiff's showing that she has been, or is genuinely threatened with the likelihood of being, subjected to such a barrier. In fact, the Court's holding means simply that an equal protection plaintiff need not establish standing by demonstrating that, but for the condition challenged as unconstitutional, she would have obtained a particular benefit. See, e.g., id. (stating that "in the context of a challenge to a set-aside program, the `injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract"). Likewise, the individual plaintiffs in the present action are not required to demonstrate that but for the weighted lottery process they would obtain admission to one of the voluntary schools. They need only demonstrate that they are ready and able to apply for admission and that the policy threatens to prevent them from applying on an equal basis with other student applicants. We deny standing because Scott has failed to demonstrate an imminent threat of enforcement of any racial or gender classification against any individual plaintiff's application to one of the voluntary schools and because, even if such a threat were imminent, Scott has failed to demonstrate that any plaintiff would suffer a barrier to her application.
 
 
 34
 Scott sought and received forward-looking relief in the form of a declaratory judgment and an injunction from the district court against PUSD, permanently prohibiting the school district from using race and gender as factors in the admissions practices of its voluntary schools. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a plaintiff must establish standing by showing "that there is a substantial controversy, between parties having adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." Watt, 643 F.2d at 624 (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)); see also Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (stating that declaratory injunctive relief may be appropriate "[w]here there is ... a concrete case admitting of an immediate and definite determination of the legal rights of the parties in an adversary proceeding upon the facts alleged"). The Supreme Court has clarified, with regard to claims seeking prospective relief under the Equal Protection Clause, that "[a]lthough `imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is `certainly impending.'" Adarand, 515 U.S. at 211, 115 S.Ct. 2097 (quoting Lujan, 504 U.S. at 565 n. 2, 112 S.Ct. 2130).
 
 
 35
 Scott must support her claim for prospective relief by presenting evidence that individual plaintiffs are ready and able to apply to the voluntary schools and that the PUSD policy prevents them from doing so "on an equal basis." See Associated Gen. Contractors, 508 U.S. at 666, 113 S.Ct. 2297. The district court concluded from the language of BP 0460(d) ¶ 8 that "[p]laintiffs may not compete on equal ground with other students for all of the seats at the three schools in question."[17] Mem. Order at 15 (first emphasis added). The court's use of conditional language is a tacit acknowledgment that the injury alleged here is far too speculative to satisfy the injury-in-fact requirement of Article III standing.
 
 
 36
 Scott attempts to fulfill the injury-in-fact requirement on two grounds. First, Scott alleges that PUSD did in fact subject the plaintiffs to a race- and gender-based admissions process when it monitored the racial and gender composition of the applicant pools for the three schools to which individual plaintiffs applied. Scott alleges that, insofar as PUSD continues to perform this monitoring function, it maintains an unconstitutional barrier to individual plaintiffs' admission to the voluntary schools. The district court agreed with this argument, but its ruling is anomalous. Although the district court found that PUSD "assigned students to the voluntary schools in a race-neutral manner for the 1999/2000 school year," the court concluded that it was "logically impossible" for the lotteries to have been run in such a manner because PUSD was required to monitor the racial composition of each applicant pool in order to determine whether race should be applied as a corrective admissions factor. Mem. Order at 15. The court's legal conclusion cannot be squared with its own factual findings.[18]
 
 
 37
 Indeed, the conclusion that PUSD's monitoring practices, standing alone, prevent the plaintiffs from applying to the voluntary schools on an equal basis (even though all applicants were subjected to the same monitoring practices)[19] places an unnecessary and impractical strain on the Article III standing requirement that the plaintiff show a concrete and particularized injury. Lujan, 504 U.S. at 560, 112 S.Ct. 2130; Warth, 422 U.S. at 508, 95 S.Ct. 2197. See also Fla. Audubon Society v. Bentsen, 94 F.3d 658, 667 n. 4 (D.C.Cir. 1996) ("[T]he plaintiff must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress."). Neither Scott nor the district court has given any plausible account of the "particularized" harm allegedly caused by monitoring the applicant pool's racial and gender composition.[20] Rather, the court seemed to hypothesize that once PUSD had monitored the applicant pool's composition, the implementation of a suspect classification was a fait accompli. This conclusion is contradicted by the facts of this case and fails to distinguish monitoring from the actual weighting of race or gender in a lottery. The court failed to consider, for example, whether the putative harm of monitoring would attach even if the District were not authorized to perform a weighted lottery to compensate for imbalances. We must conclude from the district court's opinion that monitoring is presumed to cause injury only because it might result in the implementation of a weighted lottery. We find this hypothetical injury too speculative to support standing.
 
 
 38
 Second, Scott argues that the future imposition of a racial or gender weighted lottery will pose an unconstitutional barrier to the plaintiffs' admission to PUSD voluntary schools.[21] However, Scott has failed to establish a genuine threat of enforcement on the basis of which this court could evaluate the policy's constitutionality.
 
 
 39
 In Thomas v. Anchorage Equal Rights Commission, an en banc panel of this court denied plaintiff landlords' standing to bring a First Amendment challenge against an Alaska housing law prohibiting discrimination on the basis of marital status. The Thomas panel created a three-pronged test by which a plaintiff may establish standing for prospective relief from an allegedly discriminatory governmental policy. First, the plaintiff must articulate a "`concrete plan' to violate the law in question." 220 F.3d at 1139. Scott presented affidavits before the district court representing the intentions of individual plaintiffs to apply to PUSD voluntary schools during the earliest available application cycle. However, a pledge of general intent to place oneself within the purview of a challenged policy that fails to "specify ... under what circumstances" that policy might be enforced will "not rise to the level of an articulated, concrete plan." Id.
 
 
 40
 The Thomas panel ruled that "[t]he landlords' expressed `intent' to violate the law on some uncertain day in the future — if and when an unmarried couple attempts to lease one of their rental properties — can hardly qualify as a concrete plan." Id. at 1140. Like the landlord plaintiffs in Thomas, Scott's professed intention to subject herself to a racial or gender weighted lottery is contingent upon an unpredictable set of societal factors that may or may not arise, and thereby trigger the implementation of a weighted lottery, when an individual plaintiff's application for admission to a voluntary school is made. At the next opportunity for a plaintiff to make an application, that student may be subjected to a weighted lottery, or no lottery may be conducted because no school is oversubscribed, or a lottery may be conducted at one or more schools but it may apply no weighted factor. Scott cannot base her plan to incur actual, constitutional injury upon this insurmountable contingency.[22]
 
 
 41
 Second, a plaintiff may satisfy the injury-in-fact requirement by demonstrating that government officials "have communicated a specific warning or threat" of enforcement. Id. The Thomas panel reiterated that the threat of enforcement "must at least be `credible,' not simply `imaginary or speculative.'" Id. (quoting Babbitt, 442 U.S. at 298, 99 S.Ct. 2301). PUSD has given no indication that it intends to apply a weighted factor in any future lottery. That is, the District has not represented to parents that it expects any future applicant pool to be so grossly out of balance with the district-wide student population that the application of a corrective racial or gender factor is imminent. To the contrary, PUSD Superintendent Vignes has stated that race or ethnicity would be applied as an admissions factor only under "compelling" circumstances "where [a] school was so racially identifiable that it was a segregated school or was fast moving in the direction of becoming a segregated school." Decl. of Vera Vignes (Jan. 24, 2000) ¶ 11. Vignes further qualified her assessment by stating that PUSD "ha[s] not yet faced [such] a situation." Id. Scott offers no contravening evidence. Thus, her assessment that BP 0460(d) ¶ 8 threatens a racial or gender-based admissions process in the near future at PUSD voluntary schools is purely speculative.
 
 
 42
 Third, the Thomas panel held that a claim for prospective relief can be based on a history of discriminatory enforcement of the challenged governmental policy, but the absence of such a history will support a conclusion that a potential injury is not imminent.[23] 220 F.3d at 1140. Thus, the fact that no individual plaintiff has yet been subjected to a race or gender discriminatory admissions qualification under the policy weakens Scott's claim of standing to seek prospective relief insofar as the lack of prior implementation of the policy leaves us without a basis upon which to infer that the threat to Scott is genuine. See also Lyons, 461 U.S. at 102, 103 S.Ct. 1660 ("Past wrongs [are] evidence bearing on `whether there is a real and immediate threat of repeated injury.'") (quoting O'Shea, 414 U.S. at 496, 94 S.Ct. 669).
 
 
 43
 In City of Los Angeles v. Lyons, the Supreme Court held that a plaintiff lacked standing to obtain an injunction against the Los Angeles Police Department, barring it from using choke-holds in the future, even though the plaintiff himself had previously been subjected to this police tactic, because the plaintiff could not establish the likelihood that he would be subjected to such treatment in the future. The Court instructively described the difference between the injury requirement for standing to sue for damages and standing to obtain injunctive relief, stating "[t]hat Lyons may have been illegally choked by the police ... while presumably affording Lyons standing to claim damages... does nothing to establish a real and immediate threat that he would again be stopped [for any offense], by an officer or officers who would illegally choke him." Id. at 105, 103 S.Ct. 1660. Scott presents an even weaker claim of standing in that she can establish neither past adverse treatment by an illegal practice nor real and immediate threat that she will be victimized by such a practice in the future.
 
 
 44
 The district court's ruling permits Scott to proceed to a constitutional ruling against PUSD and the Board's admissions policy without requiring any showing either that the offending policy has ever been applied against any of the named minor plaintiffs or that it will ever be so applied. The district court's ruling purports to determine that the plaintiffs had standing because they alleged that they faced a barrier in admissions; the court's ruling in fact permits the plaintiffs to bring suit without alleging that such a barrier was erected against them, but merely by alleging that it could be (at some unspecified time in the future, under some unspecified condition). The breadth of the district court's ruling provides an example of why careful adherence to the Article III case or controversy requirement is essential to the exercise of our judicial function.
 
 
 45
 Whether or not a discriminatory barrier will be erected in the future by PUSD against any student applicant (let alone one of the plaintiffs) in the form of a race-based admissions policy is too speculative to satisfy the plaintiffs' burden of demonstrating a realistic and imminent danger of direct injury as a result of the PUSD policy. Accordingly, we dismiss Scott's claims for lack of standing.
 
 B. Ripeness
 
 46
 We are further persuaded that, even if Scott were found to have established injury in fact, we would still dismiss her equal protection claim based on the prudential considerations of our ripeness jurisprudence. "[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). "In `measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'" Thomas, 220 F.3d at 1139 (quoting Gene R. Nichol, Jr., Ripeness and the Constitution, 54 U. Chi. L.Rev. 153, 172 (1987)). As a prudential matter, we will not consider a claim to be ripe for judicial resolution "if it rests upon `contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)); accord Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir.1999).
 
 
 47
 The "basic rationale" of the ripeness doctrine is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs., 387 U.S. at 148, 87 S.Ct. 1507. To determine ripeness, we must consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. 1507.
 
 
 48
 The prudential considerations of ripeness are amplified where constitutional issues are concerned. Mitchell, 330 U.S. at 90-91, 67 S.Ct. 556 ("Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of the political theories. Such abuse of judicial power would properly meet rebuke and restriction from other branches."); see also Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 345-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (establishing the rule that it is always prudent to avoid passing unnecessarily on an undecided constitutional question); see also Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 154-55, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (stating that federal courts "do not review issues, especially constitutional issues, until they have to"). The Supreme Court has neatly instructed that the jurisdiction of the federal courts to hear constitutional challenges should be exercised only when "the underlying constitutional issues [are tendered] in clean-cut and concrete form." Rescue Army v. Mun. Ct. of Los Angeles, 331 U.S. 549, 584, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). Therefore, particularly where constitutional issues are concerned, problems such as the "inadequacy of the record," Int'l Bhd. of Teamsters v. Denver Milk Producers Inc., 334 U.S. 809, 68 S.Ct. 1015, 92 L.Ed. 1741 (1948) (mem.), or "ambiguity in the record," Simmons v. W. Haven Hous., 399 U.S. 510, 511, 90 S.Ct. 1960, 26 L.Ed.2d 764 (1970) (per curiam), will make a case unfit for adjudication on the merits.
 
 
 49
 The constitutional issues in this case remain woefully unfit for adjudication. The defendants initially challenged plaintiffs' standing on a motion to dismiss before the district court. The court concluded that dismissal on standing grounds was premature, due to limited factual development, and instead instructed the parties that the standing challenge could be properly raised on a motion for summary judgment. Facing the possibility that the action might still be dismissed at summary judgment for lack of standing, the parties agreed to engage in limited discovery, reserving the option of second discovery phase to follow summary judgment. On the basis of that limited discovery, the district court granted summary judgment for the plaintiffs.
 
 
 50
 To satisfy equal protection analysis, a racial classification must be narrowly tailored to serve a compelling governmental interest. Adarand, 515 U.S. at 227, 115 S.Ct. 2097. Gender classifications must be substantially related to important governmental objectives. Craig, 429 U.S. at 197, 97 S.Ct. 451. Here, the Board has attempted to comply with the requirements of equal protection by authorizing the use of race and gender as admissions factors only "when necessary to create an integrated setting." Board Policy 0460(d) ¶ 8. The Board did not exclusively authorize these two factors, but instructed that language, socioeconomic status, and special educational needs could also be used as admissions factors for the same limited purpose. To what degree PUSD would resort to the use of non-suspect factors before suspect factors or would use targeted recruiting to obviate the need for a weighted lottery at all is a question vital to the resolution of the constitutional issues but unanswerable under the present posture.
 
 
 51
 The district court's ruling on Scott's equal protection claims abstracted this case from its proper factual context, and, as a result, it is inconsistent with the Supreme Court's instruction that strict scrutiny should not be "fatal in fact." Adarand, 515 U.S. at 237, 115 S.Ct. 2097; see also Croson, 488 U.S. at 519, 109 S.Ct. 706 (Kennedy, J., concurring) ("[A] rule of automatic invalidity for racial preferences in almost every case would be a significant break with our precedents that require a case-by-case test."). Currently, we have no basis from which to infer how racial or gender criteria might correlate with other criteria, such as socioeconomic status and language, in PUSD's actual implementation of the challenged policy. For example, we know neither if the weighted lottery system will allow for PUSD to make significant racial adjustments in its student body by considering non-suspect criteria, either in tandem with or instead of racial criteria, nor if the district would give deference to non-suspect criteria in order to circumscribe its consideration of race to conform to the requirements of narrow tailoring.[24] Moreover, even if the parties had engaged in a second discovery phase, it is unlikely that a sufficient factual basis for adjudication could have been laid relying upon the single academic cycle during which the challenged policy was in effect but did not result in the use of any weighted admissions factor.
 
 
 52
 Without knowing the conditions under which such a policy is to be implemented, no court can make a true determination as to whether the policy as practiced uses race in a way that is necessary to satisfy the compelling interest of student-body diversity. Bakke, 438 U.S. at 313-17, 98 S.Ct. 2733 (opinion of Justice Powell) (describing the importance of diversity in education as "substantial"); see also Smith, 233 F.3d at 1201 (reaffirming that Justice Powell's Bakke opinion states the law of this circuit). In addition, we cannot infer whether in the future PUSD may apply race as a factor in its admissions process for a purpose that is appropriately remedial. See Croson, 488 U.S. at 509-10, 109 S.Ct. 706 (discussing the basis for appropriately remedial use of race-based classifications under the Equal Protection Clause).
 
 
 53
 Our judicial review would "stand on a much surer footing in the context of a specific application" of the PUSD policy. Toilet Goods, 387 U.S. at 164, 87 S.Ct. 1520. Because Scott maintains that individual plaintiffs have applied and promise to continue to apply to PUSD voluntary schools despite the existence of the policy, and because an actual implementation of the challenged admissions criteria in the future will not ensure that the individual plaintiffs will not be admitted to the school of their choice, we find no hardship to Scott in declining to rule on the equal protection issue at this stage. As the Supreme Court stated when refusing to rule on the merits of Marco Defunis's moot discrimination claim, "if the admissions procedures of the [school] remain unchanged, there is no reason to suppose that a subsequent case attacking those procedures will not come with relative speed to this Court." DeFunis, 416 U.S. at 319, 94 S.Ct. 1704. And, we expect that if a challenge to the PUSD policy returns to this court, it will do so under more appropriate circumstances.
 
 C. Supplemental Jurisdiction
 
 54
 The district court asserted supplemental jurisdiction over Scott's state constitutional and statutory claims under 28 U.S.C. § 1367. However, with the dismissal of Scott's federal constitutional claim for lack of standing, we have no authority to retain jurisdiction over Scott's state law claims. 28 U.S.C. § 1367(a). By finding that Scott did not have standing to assert her federal equal protection claim, we have determined that the district court lacked subject matter jurisdiction. Thus, we have no discretion to retain supplemental jurisdiction over Scott's state law claims. See Herman Family Revocable Trust v. Teddy Bear, 254 F.3d 802, 806 (9th Cir.2001) ("If the district court dismisses all federal claims on the merits, it has discretion under § 1367(c) to adjudicate the remaining claims; if the court dismisses for lack of subject matter jurisdiction, it has no discretion and must dismiss all claims."); see also Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1255 (6th Cir.1996) (stating that, after dismissal of plaintiff's federal claims for failure to state a claim under Rule 12(b)(1), "[e]xercise of jurisdiction... would[] violate Article III of the Constitution, because the original federal claim would not have `substance sufficient to confer subject matter jurisdiction upon the court'") (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).
 
 
 55
 We therefore dissolve the district court's permanent injunction as improvidently granted, remand, and direct that this case be dismissed without prejudice.
 
 IV. CONCLUSION
 
 56
 Because the plaintiffs lack standing to challenge the District's policy, we vacate the order of the district court and remand with instruction to dismiss the action without prejudice.
 
 
 57
 VACATED AND REMANDED WITH INSTRUCTION TO DISMISS WITHOUT PREJUDICE.
 
 
 
 Notes:
 
 
 [1]
 When necessary to address factual distinctions, we will refer to the student plaintiffs individuallySee infra note 2. Otherwise, we refer to the plaintiff's collectively as "Scott."
 
 
 [2]
 Named plaintiffs represent respectively: by Sylvia Scott, minors Detrick Standmore, Kayla Hunter, Michaela Reyes, and Ronald Rucker; by René Amy, minors Camden René Amy and Marissa Laraine; by George Gordon MacPherson and Silvia Jimenez MacPherson, minor George Gordon MacPherson; by Romeo Alva, minor Jocelyne Alva
 
 
 [3]
 The individual board members include George Van Alstine, George Padilla, Jacqueline Jacobs, Bonnie Armstrong, and Lisa Fowler
 
 
 [4]
 The Policy provides in relevant part:
 The District shall recruit a diverse applicant pool, monitor the applicant pool, and target recruiting as appropriate. First consideration will also be given to the fact that some applicants may have siblings attending a voluntary or magnet school. When necessary to create an integrated setting, consideration will be given during the student assignment process to several factors, including gender, race, or ethnicity, socioeconomic status, language and special educational needs.
 BP 0460(d) ¶ 8.
 
 
 [5]
 The policy also provided, with regard to non-voluntary schools, that each student would be assigned to a school on the basis of his or her home address. Students were permitted to request transfers to other neighborhood schools and permits to attend voluntary schools. These transfers and permits were conditioned on a determination of adequacy in each school's enrollment capacity, and transferring students were not permitted to displace students residing within a school's attendance zone. Finally, the policy provided that:
 At sites where the number of students of any major ethnic group varies from the percentage of such students in the overall District student population by +/20%, no additional permits or transfers from this group may be granted into these sites.
 PUSD, Integration Policy and Quality Schooling Plan, Board Policy 0460(c) ¶ 3 [hereinafter "Board Policy 0460(c) ¶ 3"].
 Scott has called Board Policy 0460(c) ¶ 3 to our attention in her answering brief, intending to demonstrate that PUSD practiced racial discrimination even in instances where it did not apply the challenged lottery. However, the district court's ruling did not address this aspect of the policy. Judge Tevrizian specifically limited his permanent injunction to prohibit the use of race, ethnicity or gender in any future lottery. Mem. Order (Feb. 7, 2000) at 28 (enjoining the use of these criteria as provided by Board Policy 0460(d) ¶ 8). The court's grant of summary judgment as to "all of [Scott's] causes of action," Mem. Order at 27, addresses Scott's claims of racial and gender discrimination brought under the state and federal constitutions as against the lottery process; the order included no ruling on the transfer policy, and Scott has alleged no facts below supporting her standing to challenge the transfer policy. She has also failed to allege any facts from which we might ascertain the relationship, if any, between Board Policy 0460(c) ¶ 3 and the lottery process described at Board Policy 0460(d) ¶ 8.
 Moreover, Scott does not appeal the district court's failure to rule on this issue. Rather, she attempts to introduce new arguments before this court without support from any facts established below. We decline to hear them. See Law Offices of Jonathan A. Stein v. Cadle Co., 250 F.3d 716, 718 n. 3 (9th Cir.), cert. denied, Welty v. United States, ___ U.S. ___, 122 S.Ct. 215, 151 L.Ed.2d 153 (2001) (rejecting the government's attempt to raise new arguments on appeal); see also Crawford v. Lungren, 96 F.3d 380, 389 n. 6 (9th Cir.1996) ("The district court is not merely a way station through which parties pass by arguing one issue while holding back a host of others for appeal.").
 
 
 [6]
 See Act of August 21, 1998, 1998 Cal. Stat. 324 (state budget act).
 
 
 [7]
 School districts were authorized by state law to restrict intradistrict student transfers in order "to maintain appropriate racial and ethnic balances." Cal. Educ.Code § 35160.5(b)(2)(A) (1996). The same legislation required school districts to craft admissions policies for oversubscribed schools "that ensure[] that selection of pupils to enroll in the school is made through a random, unbiased process," thereby prohibiting academic and athletic performance-based pupil assignment except with regard to specialized schools or programs "if the [selective] criteria are uniformly applied to all applicants." Cal. Educ.Code § 35160.5(b)(2)(B) (1996)
 
 
 [8]
 Joseph White, who designed the computer software that performed the admission lottery and personally oversaw the operation of the lottery, provided uncontroverted testimony that the lottery "did not take into consideration race, ethnicity, color, national origin or gender of the students because the applicant pool was balanced." Decl. of Joseph White (May 11, 1999) at ¶ 10
 
 
 [9]
 "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."Ex Parte McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1868).
 
 
 [10]
 The ripeness issue will be discussed belowSee infra Section III.B.
 
 
 [11]
 We will assumearguendo that an authorization to consider racial and gender factors in the allocation of a public benefit is a racial or gender classification for equal protection purposes even though the challenged admissions policy designates no specific racial or gender group to be the beneficiary of additional consideration in its weighted lottery process. A policy that does not nominate particular groups for special consideration defies the Supreme Court's rationale for applying the suspect classification doctrine, because such a policy does not single out any particular group for disparate treatment. See, e.g., Adarand, supra (applying strict scrutiny to federal funding incentives to contractors hiring subcontracting companies controlled by "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities"); see also Croson, supra (municipal funding plan, requiring prime government contractors to set-aside 30% of public funding to minority-owned subcontractors and defining minorities as "Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts"); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (separate university admissions system advantaging "Black," "Chicano," "Asian," and "American Indian" applicants); Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (curfew applicable only to persons of Japanese ancestry).
 
 
 [12]
 We stress that it is not the imminence of the admission process that is at issue in this case (i.e., not the mere fact that PUSD was poised to operate its yearly admissions procedures), but the imminence of the District's application of the challenged provisions of the policy. Although not made clear in the record, the individual minor plaintiffs appear to be of different racial and ethnic backgrounds, as well as different genders. As a result, at the time the complaint was filed, individual plaintiffs could not have known that they would not be benefitted by implementation of the challenged provisions of the policy.
 
 
 [13]
 Scott's entire challenge might have become moot if PUSD had voluntarily discontinued the use of its weighted lottery system in response to a change in federal or state lawSee, e.g., Smith v. University of Washington Law School, 233 F.3d 1188 (9th Cir.2000) (holding that federal constitutional challenges to the University of Washington Law School admissions process had become moot because Washington State law had been altered to ban preferential treatment on the basis of race by governmental actors and the school had responded to this statutory change by discontinuing the use of race in its admissions process). However, PUSD created its weighted lottery system in 1998, after the passage of the state constitutional amendment under which Scott currently challenges the policy.
 
 
 [14]
 We note that, although the defendants refer in their opening brief to Alva as another legitimate applicant to Marshall, his eligibility was limited to the 2001-2002 academic cycle, the application deadline for which has since passed
 
 
 [15]
 Only MacPherson can credibly allege that he was harmed by the lotteries used during the 1999-2000 admissions cycle, since only he applied for and failed to receive admission to a school for which a lottery was conducted. However, MacPherson cannot demonstrate harm caused by the provisions of the policy challenged in this lawsuit, because no weighted factor of any kind was used in any lottery conducted in 1999
 
 
 [16]
 This interest is not particularized as to individual plaintiffs who have already suffered an injury due to the imposition of a racial or gender barrier to their admission to any of the voluntary schools because, as explained above, there are no such plaintiffs
 
 
 [17]
 Contrary to the district court's conclusion, the present case involves neither a limitation on the number of seats made available to students of a particular racial or gender group nor a classification of students by race or gender in order to move them into separate lottery cohorts whereby students of a particular group would not be required to compete with out-group members for available seatsCf., e.g., Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 316-17 (4th Cir.2001) (describing defendant school board's practice of assigning students to its magnet schools by using two parallel lotteries, one for African American students and one for students of other races).
 
 
 [18]
 We find no clear error in the district court's factual determination that 1999-2000 lotteries for admission to Norma Coombs and Don Benito were performed in a neutral manner, but reject its legal conclusion that the monitoring of racial stratification within each applicant pool is enough to establish injury in fact
 
 
 [19]
 There are no facts, for example, that only students of a particular race were required to disclose their race during the application process
 
 
 [20]
 We note that Scott has made no argument that individual plaintiffs in any way conformed their conduct due to the threat of the policy's potential application to their future candidacy for voluntary school enrollmentCf. Clements v. Fashing, 457 U.S. 957, 962, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (ruling that plaintiffs had standing to challenge a Texas statute governing eligibility for election to the state legislature, even though it had not yet been applied to them, because they had withheld their bids for candidacy because the statute designated them ineligible); Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 759, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (invalidating state abortion regulations as an attempt "to intimidate women into continuing pregnancies," even though the regulations had never been put into effect); see also AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 386, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (stating that if "there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements").
 
 
 [21]
 This argument by Scott, because it chiefly revolves around a question of the proper time to bring a challenge to the PUSD policy, implicates prudential aspects of our ripeness doctrine as well as the injury-in-fact component of constitutional standing. We will address the issue of ripeness in greater detail belowSee infra Section III.B.
 
 
 [22]
 Cf. Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 163, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (finding a pre-enforcement challenge to FDA regulation unripe because "[t]he regulation serves notice only that the Commissioner may under certain circumstances order inspection of certain facilities and data, and that further certification of additives may be refused to those who decline to permit a duly authorized inspection until they have complied in that regard"). The Supreme Court particularly noted in Toilet Goods that it "ha[d] no idea whether or when ... an inspection will be ordered and what reasons the Commissioner will give to justify that order." Id.
 
 
 [23]
 Here, the PUSD policy was implemented during the admissions process for the 1999-2000 school year to the extent that lotteries were used at two of the voluntary schools, but it has not been implemented since. During the one year of its use, the policy did not result in the consideration of either race or gender as an admissions factor because the applicant pools for both oversubscribed schools were determined to be "balanced."
 
 
 [24]
 We do not even know under what conditions PUSD deemed the use of racial and gender admissions criteria unnecessary, since neither party has introduced into evidence statistics by which the applicant pool for any voluntary school could be compared, in terms of its racial and gender composition, to PUSD's eligible student population during the 1999-2000 school year. As a result, we can draw no credible inference as to the conditions under which these criteria might be applied in the future